People v Addimando (2021 NY Slip Op 04364)





People v Addimando


2021 NY Slip Op 04364


Decided on July 14, 2021


Appellate Division, Second Department


Rivera, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 14, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

WILLIAM F. MASTRO, J.P.
REINALDO E. RIVERA
SYLVIA O. HINDS-RADIX
COLLEEN D. DUFFY, JJ.


2020-02485
 (Ind. No. 74/18)

[*1]The People of the State of New York, respondent,
v
Nicole Addimando, appellant.



APPEAL by the defendant from a judgment of the County Court (Edward T. McLoughlin, J.), rendered February 11, 2020, in Dutchess County, convicting her of murder in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and sentencing her to an indeterminate term of imprisonment of 19 years to life on the conviction of murder in the second degree and a concurrent determinate term of imprisonment of 15 years to be followed by 5 years of postrelease supervision on the conviction of criminal possession of a weapon in the second degree.



Sullivan & Cromwell, LLP, New York, NY (Garrard R. Beeney, Timothy J. Weinstein, James J. Browne, Samantha R. Briggs, Amanda F. Davidoff, Kamil R. Shields, Alexander M. Self, and Jennifer B. Lee of counsel), for appellant.
Robert V. Tendy, Special District Attorney, Carmel, NY (Larry Glasser of counsel), for respondent.
Frankfurt Kurnit Klein & Selz, P.C., New York, NY (Tyler Maulsby of counsel), Walden Macht & Haran, LLP, New York, NY (Jeffrey A. Udell of counsel), Rubin Law, PLLC, New York, NY (Denise A. Rubin of counsel), and Joseph Hage Aaronson, LLC, New York, NY (Christopher J. Stanley of counsel), for amicus curiae New York City Bar Association (one brief filed).
Davis Polk & Wardwell, LLP, New York, NY (Marissa K. Perry, Maura Douglas, and Brianne Holland-Stergar of counsel), for amici curiae Sanctuary for Families, Day One New York, National Network to End Domestic Violence, Safe Horizon, Inc., Her Justice, Urban Resource Institute, Urban Justice Center, Empire Justice Center, Legal Momentum, New York Legal Assistance Group, New York City Alliance Against Sexual Assault, and Lawyers Committee Against Domestic Violence.
Duane Morris, LLP, New York, NY (Sharon L. Caffrey and Leah A. Mintz, pro hac vice, and Eric R. Breslin of counsel), for amici curiae Jeffrion L. Aubry, Brian A. Benjamin, Alessandra Biaggi, David Carlucci, Andrew Gounardes, Brad Hoylman, Monica R. Martinez, Shelley B. Mayer, Zellnor Myrie, Kevin S. Parker, Roxanne J. Persaud, Gustavo Rivera, Diane J. Savino, and Luis R. Sepúlveda.



RIVERA, J.


OPINION & ORDER
On the instant appeal, this Court is presented, inter [*2]alia, with the question of whether the County Court properly applied the Domestic Violence Survivors Justice Act (Social Services Law § 459-a et seq.), effective May 14, 2019, which amended Penal Law § 60.12 (hereinafter the DV Survivor's Act or Penal Law § 60.12). The DV Survivor's Act permits courts to impose reduced alternative sentences in certain cases involving defendants who are victims of domestic violence. This case appears to be the first time that an appellate court has the opportunity to address the DV Survivor's Act.
For the reasons now set forth, we hold that the County Court did not properly apply the DV Survivor's Act when sentencing the defendant. Upon considering the plain language of the DV Survivor's Act, the legislative history of the statute, and the particular circumstances of this case, we modify the judgment, on the facts and as a matter of discretion in the interest of justice, by reducing (1) the term of imprisonment imposed on the conviction of murder in the second degree from an indeterminate term of imprisonment of 19 years to life to a determinate term of imprisonment of 7½ years to be followed by 5 years of postrelease supervision, and (2) the term of imprisonment imposed on the conviction of criminal possession of a weapon in the second degree from a determinate term of imprisonment of 15 years to be followed by 5 years of postrelease supervision to a determinate term of imprisonment of 3½ years to be followed by 5 years of postrelease supervision, which terms shall run concurrently with each other.
Sometime during the night of September 27, 2017, and the morning of September 28, 2017, the defendant fatally shot Christopher Grover, who was her domestic partner and the father of her two children. According to the defendant and several others who testified at the approximately one-month jury trial, the defendant had been repeatedly subjected to brutal physical and sexual abuse at the hands of Grover for many years. The jury rejected the defendant's battered women's syndrome justification defense, and found her guilty of murder in the second degree and criminal possession of a weapon in the second degree.
The defendant moved to be sentenced under the DV Survivor's Act. Following a hearing at which the defendant adduced additional evidence that she had been abused, the County Court denied her motion and sentenced the defendant to an indeterminate term of imprisonment of 19 years to life on the conviction of murder in the second degree and a concurrent determinate term of imprisonment of 15 years to be followed by 5 years of postrelease supervision on the conviction of criminal possession of a weapon in the second degree.
I. The DV Survivor's Act/Penal Law § 60.12
As long-recognized, "[w]hen presented with a question of statutory interpretation, our primary consideration is to ascertain and give effect to the intention of the Legislature" (People v Wallace, 31 NY3d 503, 507 [internal quotation marks omitted]; see Kuzmich v 50 Murray St. Acquisition LLC, 34 NY3d 84, 91; Samiento v World Yacht Inc., 10 NY3d 70, 77-78; Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660). As the statutory text is the clearest indicator of legislative intent (see People ex rel. Negron v Superintendent, Woodbourne Corr. Facility, 36 NY3d 32, 36; Matter of New York County Lawyers' Assn. v Bloomberg, 19 NY3d 712, 721), the starting point of interpretation must always be the language of the text itself (see Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583). The text is interpreted "according to its natural and obvious sense, without resorting to an artificial or forced construction" (McKinney's Cons Laws of NY, Book 1, Statutes § 94).
Penal Law § 60.12(1) provides:
"the court, upon a determination following a hearing that (a) at the time of the instant offense, the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of the same family or household as the defendant as such term is defined in subdivision one of section 530.11 of the criminal procedure law; (b) such abuse was a significant contributing factor to the defendant's criminal behavior; (c) having regard for the nature and circumstances of the crime and the history, character and condition of the defendant, that a sentence of imprisonment pursuant to section 70.00, 70.02, 70.06 or subdivision two or three of section 70.71 [of the Penal Law] would be unduly harsh may instead impose a sentence in accordance with this section."
The language of the DV Survivor's Act clearly and unambiguously sets forth three factors for a court to consider, namely: (1) whether the defendant was a victim of domestic violence inflicted by a member of the same family or household; (2) whether the abuse was a significant contributing factor to the defendant's criminal behavior; and (3) whether, having regard for the nature and circumstances of the crime and the history, character, and condition of the defendant, a sentence in accordance with the customary statutory sentencing guidelines would be unduly harsh.
The statute does not expressly set forth the standard of proof or the appropriate evidentiary burden that must be borne by the defendant, as the movant. Utilizing as comparison the evidentiary standard applicable on a motion to vacate a judgment and set aside a sentence (see CPL 440.30[6] [at a hearing on a motion to vacate a judgment and set aside a sentence, the defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion]), we apply the preponderance of the evidence standard to our review and analysis herein. At the commencement of the subject hearing, the parties agreed that this was the appropriate standard of proof, and the County Court applied this standard. The preponderance of the evidence standard requires enough evidence to "produce a reasonable belief in the truth of the facts asserted" (Jarrett v Madifari, 67 AD2d 396, 404 [internal quotation marks omitted]). "A party who has the burden of proof by a preponderance of the evidence must prove his or her contention by the greater weight of evidence" (8 Carmody-Wait 2d § 56:14).
Although the strongest indication of the statute's meaning is in its plain language, "the legislative history of an enactment may also be relevant and is not to be ignored, even if words be clear" (People v Badji, 36 NY3d 393, 399 [internal quotation marks omitted]). The legislative history reveals that the statute sought to address harsh punishment received by victims of domestic violence who commit crimes against their abusers. "[A]ll too often in our court system when women are defending themselves against domestic violence, instead of being met with a judge with compassion and assistance and help, the judge is just putting forth punishment" (Stenographic Record at 1572, NY Senate Bill S1077, Mar. 12, 2019 [statement of Senator Carlucci]).
The sponsors of this law intended for a sentencing court to exercise discretion in its analysis of the aforementioned three factors:
"We are not saying that you throw out what they've done out of the window in the sentencing. The judge still has the discretion. We're asking the judge to take into consideration what they have gone through, what they were living with" (Stenographic Record at 1570, NY Senate Bill S1077, Mar. 12, 2019 [statement of Senator Persaud]).
"MR. RA: Okay. Now you mentioned earlier that there are certain exceptions in terms of crimes that this would not apply to, but there are some violent offenses that this still would apply to like manslaughter, first degree assault, battery, robbery; it would apply to those crimes?
"MR. AUBRY: Yes and, again, because we're giving the judge discretion, he or she can look at those issues and determine whether or not eligibility has been met and whether it's in the interest of justice" (Chamber Video/Transcript at 12-13, 2019 NY Assembly Bill A03974).
"MR. AUBRY: [A]gain, the bill is subject to the discretion of the judge" (Chamber Video/Transcript at 13, 2019 NY Assembly Bill A03974).
"MR. RA: Okay. So in terms of proving the abuse. What—what is the procedure for the—for the victim of domestic violence? Does there have to be formal documentation, formal charges having been filed regarding the domestic violence? How do they go about proving that they are a victim of domestic violence?
"MR. AUBRY: There are three tests that has [sic] to be required. The application for this—and, again, this is—gives the judge the discretion to provide this relief. That—this is not an automatic situation. This gives the judge an opportunity to look at the evidence that will be provided to determine whether relief should be granted or not. One form of the evidence to be provided is a court record, a Social Service record, hospital record, sworn statement from a witness of the domestic violence, law enforcement record or an order of protection or domestic incident report.[FN1]
"MR. RA: Okay. And then once—once they've—once the court has determined that the person is a victim of domestic violence and qualifies for this reduced sentence, what—what is the sentencing range for that individual then?
"MR. AUBRY: It would depend on the type of crime. Again, we're leaving that to the judge to make that determination. Looking at this—individual cases as these kind of cases are going to be individually looked at.
"MR. RA: Now, is it correct, though, that once the person is deemed to have qualified by—by the judge that they then can be—essentially the minimum sentence becomes the maximum they can be sentenced to?
"MR. AUBRY: Right. It does reduce the sentences greatly, but the judge has the discretion to establish that. We're not—we are empowering the judge in this case, not commanding the judge" (Chamber Video/Transcript at 11-12, 2019 NY Assembly Bill A03974).
Significantly, the exercise of discretion of a sentencing court does not translate into unfettered judgment. Our role as an intermediate appellate court in reviewing sentences imposed is "an important responsibility to assure that sentences in given cases are not 'unduly harsh or severe under the circumstances'" (People v Janvier, 186 AD3d 1247, 1250, quoting People v Delgado, 80 NY2d 780, 783). CPL 470.15(3) confers upon this Court the authority to modify sentences in the exercise of discretion in the interest of justice (see People v Suitte, 90 AD2d 80, 85-86).
Against this backdrop, we evaluate the determination of the County Court to deny the defendant's motion for sentencing under Penal Law § 60.12. The County Court authored a decision, purporting to apply the three-part factors and reviewing aspects of the evidence presented at the trial which it deemed significant. Upon doing so, the court ultimately determined that the defendant failed to sustain her burden of proof pursuant to Penal Law § 60.12 and thus, denied the defendant's motion pursuant to that statute.
The County Court recognized that the "defendant present[ed] a compelling story of [*3]abuse, with horrific allegations that include repeated, sadistic sexual violence and physical abuse, complete with pictures and eyewitnesses viewing the results of her abuse" (People v Addimando, 67 Misc 3d 408, 438 [Dutchess County Ct]). Nevertheless, the court indicated that the People raised "critical questions about the defendant's testimony regarding her alleged abuse, the identity of her abuser and her violent acts and decisions on September 27, 2017" (id. at 438).
The County Court identified "four factual bases" to support its decision (id. at 439). First, it found that the abuse history presented by the defendant was "undetermined and inconsistent regarding the extent of the abuse, as well as the identity of her abuser(s)" (id.). Second, it stated that the "nature" of the alleged abusive relationship between the defendant and Grover was "undetermined," based on the demeanor and behavior of Grover on the day of and prior to his death (id.). Third, it concluded that the defendant had "a tremendous amount of advice, assistance, support, and opportunities to escape her alleged abusive situation," and thereby could have "avoid[ed]" the decision to take Grover's life (id.). Fourth, the court considered "most importantly" the specific facts of the homicidal act itself, where the defendant shot Grover "point-blank" in his temple as he laid "supine, with his eyes closed" (id. at 440).
Essentially, the County Court found that while it was presumed the defendant may have been abused in her life, the choice she made that night and the manner in which the murder occurred outweighed what the court referred to as the defendant's "undetermined abusive history" (id. at 442).
Upon our extensive review of the evidence, we reject the County Court's methodology, approach, application, and analysis of the three factors, as set forth under Penal Law § 60.12(1).
First, contrary to the County Court's determination, the abuse history was not "undetermined." Instead, the defendant established, through her lengthy testimony, photographs, and other evidence that Grover repeatedly abused her physically and sexually. The defendant testified that Grover burned her with a metal spoon that he heated on the stove. In December 2014, Grover forced her to have sex by strangling her with the belt of her bathrobe. A photograph taken in February 2015, the day after the defendant's second child was born, depicted a visible bruise on her breast. According to the defendant, Grover watched violent pornography and demanded that the defendant reenact the scenes that he viewed. During 2016 and 2017, Grover burned her numerous times, "always in the kitchen and always from a spoon," hit her leaving bruises, and forcibly penetrated her vaginally and anally with a wine bottle and "fake knives" made of PVC.
Second, the County Court's determination that there was insufficient proof that the abuse was a significant contributing factor in the defendant's acts is unfounded. Specifically, the court found that the "choices the defendant made on September 27, 2017, and the choices the defendant did not make on or before September 27, 2017, combined with the undetermined abuse history and the decedent's personality profile, provide insufficient evidence to sustain the defendant's burden that her act was caused by abuse that was a 'significant contributing factor'" (People v Addimando, 67 Misc 3d at 441). The court stated that "[t]he factual scenario surrounding the homicide and the events within several days therein create a question as to whether the purported abuse was a significant contributing factor. In other words, because the defendant had numerous opportunities to avoid any further abuse and was capable of communicating 'direct' sentiments to Grover, it is unknown what motive compelled the defendant" (id.). Basically, the court premised its analysis on a presumption or notion that the defendant could have avoided further abuse at the hands of Grover. We will not engage in any such presupposition. The evidence, which included a detailed history of repeated sexual, physical, and psychological abuse by Grover against the defendant, expert testimony regarding the impact of that abuse on the defendant, and the defendant's testimony regarding the events prior to the subject shooting, established that the abuse was a significant contributing factor to the defendant's criminal behavior. Among other things, the defendant testified that she was "pretty sure [Grover] was going to kill" her. On the night of the subject shooting, Grover told the defendant that "he could kill [her] in [her] sleep," asking whether "someone would wake up first or just die right away." According to the defendant, Grover then showed her diagrams of a human brain on his telephone, stating "I could shoot you in this part and you would die right away. But if I killed you in this part, you wouldn't be able to talk or remember things." When the defendant retreated to the bathroom, Grover followed her and threatened that he "could shoot [her] in the shower, but it would echo." Thereafter, according to the defendant, Grover pushed her down, shoved his penis into her mouth, pulled her by her throat, and raped her, causing [*4]her to bleed vaginally. Further, just prior to the subject shooting, Grover menaced, "I'm going to kill you, I'm going to kill myself, and then your kids have no one." The defendant described that, "[a]s soon as he said that," she "took one last step towards him, . . . lunged, and . . . pulled the trigger."
Third, we disagree with the County Court's finding that "having regard for the nature and circumstances of the crime and . . . history, character and condition of the defendant," a sentence within the normal statutory sentencing guidelines would not be "unduly harsh" (id. at 411). In effect, the court engaged in a weight of the evidence analysis. The court again based this finding on, inter alia, an arcane belief/suggestion that the defendant could have avoided the murder by withdrawing from her apartment, which are antiquated impressions of how domestic violence survivors should behave (see id. at 441). It appears that the court found that because the defendant could have withdrawn from her apartment or escaped from Grover, a reduced sentence under Penal Law § 60.12 was unwarranted. Clearly, if the defendant had not committed the fatal shooting, or had she escaped prior thereto, or had her actions been found to be legally justified, Penal Law § 60.12 would have no application or effect in this case. When assessing this factor, the court failed to fully take into account the impact of physical, sexual, and/or psychological abuse on the defendant as a domestic violence survivor. In fact, it all but discounted the defendant's evidence and proof, repeatedly referring to the abuse the defendant and others testified to as "undetermined." This approach simply runs afoul of the spirit and intent of the statute. It is unacceptable that, in reflecting the views of a more enlightened society, the Legislature saw fit to enact the DV Survivor's Act, only to have the court frustrate that legislative intent by applying outdated notions regarding domestic violence issues.
Upon consideration of the nature and circumstances of the crime, as well as the history, character, and condition of the defendant, we conclude that a sentence in accordance with the DV Survivor's Act is warranted. The defendant is a 32-year-old mother of two young children, and has no known prior arrests or convictions. The defendant testified that she was repeatedly physically and sexually abused by Grover, as well as by other men in her past, and reportedly was sexually assaulted at the age of five. However, our examination under this factor does not end there. We also consider, among other things, the details of the crimes, including that the defendant shot Grover in the head as he was lying on the couch. Grover's fatal injury was described as a hard contact wound in which the gun fired by the defendant was pressed against Grover's skin, leaving a muzzle imprint.
Based on the foregoing, we modify the judgment, on the facts and as a matter of discretion in the interest of justice, to the extent indicated herein (see CPL 470.15[6][b]; Penal Law § 60.12[2], [3]).
II. Additional Issues Raised by the Defendant
A. Disqualification of the Defendant's Counsel
The defendant asserts that the County Court erred in granting the People's motion to disqualify the Dutchess County Public Defender (hereinafter the Public Defender) from representing her on the ground that an attorney from the office of the Public Defender previously represented a potential witness at the defendant's trial, and apparently advised that witness that he was not obligated to speak to the prosecution's investigator regarding the defendant's case. The potential witness was someone whom the defendant alleged also had abused her and could have been called by the People to refute the defense of battered women's syndrome.
"[A] court commits reversible error where it interferes with an established attorney-client relationship without making 'threshold findings that [the attorney's] participation would have delayed or disrupted the proceedings, created any conflict of interest, or resulted in prejudice to the prosecution or the defense'" (People v Espinal, 10 AD3d 326, 329, quoting People v Knowles, 88 NY2d 763, 767). Here, the County Court providently exercised its discretion in granting the People's motion to disqualify the Public Defender upon its finding that the defendant's continued representation by the Public Defender created a conflict of interest.
Generally, "[a] conflict of interest is involved if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person" (Restatement [Third] of the Law Governing Lawyers § 121; see Rules of Professional Conduct [22 NYCRR 1200.0] rules 1.7, 1.9). "The Code of Professional Responsibility establishes ethical standards that guide attorneys in their professional conduct, and its importance is not to be diminished or denigrated by indifference" (S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp., 69 NY2d 437, 443, citing Matter of Weinstock, 40 NY2d 1, 6). However, when raised in litigation, [*5]"which in addition to matters of professional conduct directly involves the interests of clients and others[,] the Code provisions cannot be applied as if they were controlling statutory or decisional law" (S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp., 69 NY2d at 443):
"'When we agree that the Code applies in an equitable manner to a matter before us, we should not hesitate to enforce it with vigor. When we find an area of uncertainty, however, we must use our judicial process to make our own decision in the interests of justice to all concerned'" (id., quoting J.P. Foley & Co., Inc. v Vanderbilt, 523 F2d 1357, 1360 [2d Cir] [Gurfein, J., concurring]).
Thus, where the Rules of Professional Conduct (22 NYCRR 1200.0) are invoked in litigation, courts "are not constrained to read the rules literally or effectuate the intent of the drafters, but look to the rules as guidelines to be applied with due regard for the broad range of interests at stake" (Midwood Chayim Aruchim Dialysis Assoc., Inc. v Brooklyn Dialysis, LLC, 82 AD3d 1177, 1178 [internal quotation marks omitted]; see also Gabel v Gabel, 101 AD3d 676, 676-677).
A determination to substitute or disqualify counsel falls within the trial court's discretion (see People v Watson, 26 NY3d 620, 624; People v Carncross, 14 NY3d 319, 330; People v Tineo, 64 NY2d 531, 536). "'That discretion is especially broad when the defendant's actions with respect to counsel place the court in the dilemma of having to choose between undesirable alternatives, either one of which would theoretically provide the defendant with a basis for appellate review'" (People v Watson, 26 NY3d at 624, quoting People v Tineo, 64 NY2d at 536; see People v Carncross, 14 NY3d at 330). Criminal courts faced with counsel who allegedly suffer from a conflict of interest must balance two conflicting constitutional rights: (1) the defendant's right to effective assistance of counsel; and (2) the defendant's right to be represented by counsel of his or her own choosing (see US Const 6th Amend; People v Watson, 26 NY3d at 624; People v Carncross, 14 NY3d at 327; People v Gomberg, 38 NY2d 307, 312-313). Thus, a court confronting a conflict of interest faces the prospect of having its decision challenged no matter how it rules—if the court permits the attorney to continue and counsel's advocacy is impaired, the defendant may claim ineffective assistance due to counsel's conflict; whereas, if the court relieves counsel, the defendant may claim that he or she was deprived of counsel of his or her own choosing (see Wheat v United States, 486 US 153, 161; People v Watson, 26 NY3d at 624; People v Carncross, 14 NY3d at 330).
"[I]t is often difficult to assess these conflicts prospectively, before the court is fully aware of 'the evidence to be adduced, the strategies to be followed and all defenses that may be plausibly asserted'" (People v Carncross, 14 NY3d at 327, quoting People v Gomberg, 38 NY2d at 314). Thus, a defendant's willingness to waive the conflict at an early stage does not end the inquiry (see People v Carncross, 14 NY3d at 327), and it is within the court's authority to decline to accept such a waiver (see People v Watson, 26 NY3d at 627; People v Carncross, 14 NY3d at 327-328). As such, the trial court "'must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses'" (People v Carncross, 14 NY3d at 328, quoting Wheat v United States, 486 US at 163; see People v Watson, 26 NY3d at 627). "[D]oubts as to the existence of a conflict of interest are resolved in favor of disqualification in order to avoid even the appearance of impropriety" (Matter of Janczewski v Janczewski, 169 AD3d 795, 797).
Under the circumstances of this case, had the witness been called by the People, the Public Defender would not have been ethically permitted to cross-examine the witness as to the underlying facts of the prior case, creating a conflict of interest. The County Court was in an unwinnable position, one the court providently resolved in favor of disqualification.
B. Hearsay Testimony Before the Grand Jury
The defendant contends that the County Court erred in denying her motion to dismiss the indictment based upon certain hearsay testimony presented to the grand jury by a detective who tested the firearm utilized by the defendant.
The "exceptional" remedy of dismissal of an indictment is warranted only where prosecutorial misconduct, fraudulent conduct, or errors created a possibility of prejudice (People v Huston, 88 NY2d 400, 409; see People v Burch, 108 AD3d 679, 680). Typically, the submission of some inadmissible evidence during the grand jury proceeding will be deemed fatal only when the [*6]remaining evidence is insufficient to sustain the indictment (see People v Huston, 88 NY2d at 409; People v Avant, 33 NY2d 265, 271; People v Miles, 76 AD3d 645).
In the context of grand jury procedure, "legally sufficient evidence means proof of a prima facie case, not proof beyond a reasonable doubt" (People v Gordon, 88 NY2d 92, 95-96). A court reviewing the legal sufficiency of evidence presented to the grand jury must determine whether that evidence, when viewed in the light most favorable to the People, if unexplained and uncontradicted, would warrant conviction by a petit jury (see People v Jensen, 86 NY2d 248, 251; People v Campbell, 69 AD3d 645).
Here, the admission of the subject hearsay testimony, while improper, did not impair the integrity of the grand jury proceeding to the extent that dismissal of the indictment was required (see People v Carncross, 59 AD3d 1112, 1114, affd 14 NY3d 319; People v Smith, 289 AD2d 597). The grand jury proceeding did not fail to conform to the requirements of CPL article 190 to such a degree that the integrity thereof was impaired and, in view of the sufficiency of the independent, admissible proof which supported the indictment, no prejudice to the defendant could have resulted from the improperly elicited testimony (see People v Kappen, 142 AD3d 1106; People v Simon, 101 AD3d 908, 909; People v Miles, 76 AD3d 645).
C. The Defendant's Belated Exercise of a Peremptory Challenge
The defendant argues that the County Court erred in rejecting her belated request to exercise a peremptory challenge as to juror number 10.
CPL 270.15(2) provides:
"Upon the completion of [questioning] by both parties, . . . [t]he people must exercise their peremptory challenges first and may not, after the defendant has exercised his peremptory challenges, make such a challenge to any remaining prospective juror who is then in the jury box. . . . The prospective jurors who are not excluded from service must retain their place in the jury box and must be immediately sworn as trial jurors."
"Under CPL 270.15, . . . the decision to entertain a belated peremptory challenge is left to the discretion of the trial court, in recognition that the voir dire process can often be time-consuming and requires practical limitations" (People v Jabot, 93 AD3d 1079, 1081). A court may deny a belated peremptory challenge to an unsworn prospective juror "where the challenge would interfere with or delay the process of jury selection" (id. at 1081; see People v Monroe 118 AD3d 916; People v Leakes, 284 AD2d 484).
Here, as noted by the People in their brief, by the time of the defendant's belated challenge as to juror number 10, the County Court and the parties had considered two additional sets of prospective jurors, the People had exercised four additional peremptory challenges, the defendant had exercised three more challenges, and an additional juror had been selected. Accordingly, under the circumstances of the instant case, the court providently exercised its discretion in denying the defendant's peremptory challenge (see People v Monroe, 118 AD3d at 916; People v Brown, 52 AD3d 248, 248; People v Leakes, 284 AD2d at 484; People v Smith, 278 AD2d 75, 76).
D. The Defendant's Remaining Contention
The defendant's remaining contention, regarding the County Court's exclusion of certain internet website user profile information from evidence, does not warrant reversal.
III. Conclusion
The DV Survivor's Act/Penal Law § 60.12 was passed in recognition that less harsh sentences may be imposed in certain appropriate cases involving domestic violence survivors. We are persuaded that the instant case is such an appropriate case. Accordingly, we give the DV Survivor's Act its intended effect, consistent with the reasons for its implementation, and reduce the sentences imposed accordingly.
MASTRO, J.P., HINDS-RADIX and DUFFY, JJ., concur.
ORDERED that the judgment is modified, on the facts and as a matter of discretion in the interest of justice, by reducing the sentence imposed on the conviction of murder in the second [*7]degree from an indeterminate term of imprisonment of 19 years to life to a determinate term of imprisonment of 7½ years to be followed by 5 years of postrelease supervision, and the sentence imposed on the conviction of criminal possession of a weapon in the second degree from a determinate term of imprisonment of 15 years to be followed by 5 years of postrelease supervision to a determinate term of imprisonment of 3½ years to be followed by 5 years of postrelease supervision, which sentences shall run concurrently; as so modified, the judgment is affirmed.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1: At the trial, the defendant testified, at length, regarding the abuse inflicted upon her by Grover. She described going to Vassar Brothers Hospital in September of 2014, and identified photographs taken by a forensic nurse depicting, among other things, injuries to her face and body, as well as burns to her breasts, labia, and thighs caused by Grover. Multiple trial witnesses described their observations, during various times from 2014 to 2017, of bruises, wounds, and/or burns to the defendant's face and body. The defendant's midwife testified regarding her examination of the defendant on three separate occasions in 2017, when she observed that the defendant's vulva and rectum were bruised, swollen, and bleeding. Indeed, the midwife testified that she had a "hard time looking" at the defendant's injuries. The defendant reported to her therapist accounts of the violence and abuse. The defendant testified that her therapist urged her to meet with the police, and that they discussed safety plans on how the defendant could leave Grover.