People v T.S. (2025 NY Slip Op 50685(U))

[*1]

People v T.S.

2025 NY Slip Op 50685(U)

Decided on April 29, 2025

Supreme Court, Bronx County

Stone, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 29, 2025
Supreme Court, Bronx County

The People of the State of New York

against
T.S., Defendant.

Ind. No. 70946-22

ADA Megan Leo and ADA Tanya Apparicio, Office of the Bronx County District Attorney, for the People.
Aurora Maoz, Esq., Avery McNeil, Esq., and Alyssa Work, Esq., The Bronx Defenders, for the Defendant.

Audrey E. Stone, J.

On February 17, 2022, the defendant, T.S., stabbed her former intimate partner multiple times about the face and head. Due to the injuries caused by the defendant, the complainant underwent surgery to his neck and received stitches on his hand and neck. The severity of the offense and the defendant's guilt are not in question. The only dispute centers on Ms. T.S.'s reasons for stabbing the complainant and whether she should receive the benefit of a sentence pursuant to the Domestic Violence Survivors Justice Act ("DVSJA"), Penal Law § 60.12.
During pre-trial plea negotiations, defense counsel provided the People with submissions that included a pre-pleading memorandum, psychological records, a trauma narrative, and an expert report documenting that the defendant suffered from Post Traumatic Stress Disorder ("PTSD"). The defendant also engaged in extensive programming through STEPS to End Family Violence, a program that provides counseling to criminalized survivors of domestic violence. The parties' negotiations led to an impasse, with the People advocating for state prison and the defense for probation pursuant to the DVSJA. On January 13, 2025, the defendant entered a plea to Attempted Murder in the Second Degree (Penal Law § 110/125.25[1]), requested a hearing pursuant to Penal Law § 60.12, and sought a sentence recommendation from the Court. Following an extensive hearing, and for the following reasons, the Court finds that the defendant qualifies for alternative sentencing pursuant to the DVSJA. 
Factual Findings
Both sides presented evidence, and the Court took judicial notice of filings, including previous progress reports of the defendant's compliance with STEPS programming and her lack of a criminal history. The defense case included testimony from the defendant, a psychological expert, Dr. Adeyinka Akinsulure-Smith, and a medical expert, Dr. Kimberly Cullin. Numerous [*2]exhibits were received into evidence including a trauma narrative prepared by the defendant's caseworker from STEPS to End Family Violence, Dr. Akinsulure-Smith's psychological report and evaluation, prior Domestic Incident Reports ("DIRs") listing the complainant as a suspect in allegations involving a different woman, medical records of the complainant, and body worn camera footage from the date of the incident. The evidence also included body worn camera footage from a prior incident involving the complainant and the defendant, as well as a resulting DIR and family offense petition filed by the defendant in Bronx Family Court. 
The defendant testified extensively over the course of two separate appearances. Her physical demeanor exhibited a significant reluctance to share details of her traumatic past. When questioned about sensitive topics, the defendant rubbed her thighs and at other times responded with a quizzical air seemingly unable to process the questions posed. Regarding her background, the defendant testified that she never knew her father. At around the age of two, her mother entered a relationship with a man named J.C. and gave birth to a son. The defendant described J.C. as a functional crack addict who would take her and her younger brother on long walks to various drug programs and meetings. J.C. often sold personal belongings of the defendant's mother to pay for drugs and alcohol causing stress in their relationship.
When the defendant was around 10 years old, in 2005, the defendant's mother moved her and her brother to Baltimore. There the defendant's mother met N.D., who she would later wed and have a daughter with. N.D. cheated with other women, and saddled the defendant's mother with financial debt, expecting her to pay the mortgages on the family's homes. The defendant witnessed name calling by N.D. and his attempts to assuage his abuse by apologizing and giving her mother gifts. Ms. T.S. assumed parental responsibilities at a young age and experienced abuse in the form of corporal discipline. The defendant testified that she learned from her mother's experiences to "mask emotions" and "not cry be strong for your kids." 
The defendant's early childhood trauma exponentially increased her risk of developing social, health and emotional problems. Dr Akinsulure-Smith concluded that the defendant scored a 6 out of 10 on the Adverse Childhood Experiences (ACE) instrument meaning that she had been exposed to six of the ten categories used in identifying experiences of childhood trauma. In the defendant's case, these experiences included her stepfather's substance abuse, witnessing domestic violence perpetrated against her mother, her father's absence throughout her childhood, and having many family members who suffered from mental illness. Dr. Akinsulure-Smith also identified the defendant as a "parentified child" and explained that people who were parentified as children often feel the need to take care of others and are less willing to seek help for themselves. 
Exacerbating the effects of this childhood trauma on Ms. T.S.'s mental health was her rape by her best friend's brother at a party. During this testimony, the defendant actively froze, stating "can you move on from this question." As the defendant grew into young adulthood, she gave birth to a son in July 2018. Ms. T.S.'s relationship with her son's father and his family she described as tense and unpredictable. According to Ms. T.S.'s testimony (which was neither contradicted nor substantiated), her son's paternal grandmother frequently reported her to child protective services for unfounded allegations of neglect. 
Against this background, the defendant entered a romantic relationship with the complainant. The defendant entered the relationship with knowledge that the complainant was married. At the outset, their relationship consisted of phone calls and dates at her workplace. About a year into the courtship, the complainant encountered legal difficulties with his wife and [*3]in need of a place to stay due to an order of protection excluding him from the marital home. In May 2021, the complainant moved into the defendant's small apartment in the Bronx where she lived with her young son. Within a month, the relationship grew stressed. The complainant did not contribute financially to the household. The defendant testified that ongoing fights led neighbors to call the police that June. According to the defendant, the complainant drank excessively, discouraged her from speaking to her family on the phone, and pressured her into unwanted sexual relations. He voiced dissatisfaction about food she prepared and call her names, such as a "fat bitch." The defendant's employment at Yankee Stadium required her to work late after games and the complainant would call and text with accusations that she was having an affair. The complainant spoke about his access to guns and kept knives on the dresser in the bedroom. Ms. T.S. described herself as living in a constant state of fear and unease. 
Approximately three months after the complainant moved into the defendant's apartment, in August 2021, the complainant called 911 and reported that the defendant stabbed him with a knife. While the complainant was speaking to the 911 operator, the defendant chimed in and told the operator that she had not stabbed him and hung up the phone. The defendant testified that prior to the complainant's call to 911, the parties had been arguing, that the complainant had been drinking and that she had asked him to leave her apartment and return her key.
Body worn footage and testimony corroborate the ensuing events. When the police arrived, the complainant denied that he reported to 911 being stabbed. Trying to demonstrate what had occurred, the complainant reached towards a knife prompting the police to bring him outside the apartment. Once outside, the complainant continued to act in a belligerent manner consistent with intoxication. The police accompanied the complainant inside the apartment to gather belongings and leave for the night. Inside the apartment, once the parties had been separated, the police discussed with the defendant her legal options and asked her to fill out a DIR. The officers advised her that her boyfriend had rights as a squatter and that she would need an order of protection for him to be removed from her residence. As she filled out the report, the police milled about the apartment and did little to elicit meaningful information on the nature of the relationship or the reasons she wanted him to leave.
Following police advice, Ms. T.S. went to the Bronx Family Court. Someone, whom the defendant believed to be a court clerk, assisted her in filling out a family offense petition. In the petition, she stated that, on August 9, 2021, after an argument, the complainant called 911 and made a false report that she had stabbed him. The petition also stated that the complainant "made threats to me saying he can get me killed, he doesn't own a gun but can get access to one." The petition also included an allegation that in May the parties had a physical altercation where the complainant choked and slapped her. The Family Court issued a full temporary order of protection. However, the police did not serve the order, and the defendant did not return to court leading to dismissal of the case. 
The August call to the police and events that transpired as a result increased the defendant's isolation and sense of helplessness. The police admonition that the complainant was a squatter with legal rights to the residence, intimated that the defendant could not simply break off the relationship and ask him to leave. The police failure to serve the temporary order of protection on the defendant left the defendant with an unenforceable order. Soon, the complainant returned to Ms. T.S.'s apartment. Data relating to risk and lethality would support the defendant's elevated fear once the complainant returned to her home. (see People v. J.B., 83 Misc 3d 471, 475-76 [Sup Ct, Bronx Co 2024] [Stone, J.]; Jacquelyn C. Campbell et al., The [*4]Danger Assessment: Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide, available at 
https://www.dangerassessment.org/uploads/DA_Validation_of_a_Lethality_Risk_Assessment_Instrument-Campbell.pdf [last accessed April 28, 2025]). The presence of knives in the bedroom, the threats to the defendant, his jealous conduct, forced sexual relations, history of strangulation, and the complainant's stated access to firearms represented a risk to the defendant and her child. Further, the complainant's ongoing belittling of the complainant, alcohol consumption, and verbal abuse seemingly impacted the defendant's self-esteem and depressive tendencies from her past trauma. As Dr. Akinsulure-Smith testified, Ms. T.S.'s family noticed a change in her behavior, and that she became less engaged in her communications. 
It is within these circumstances that the defendant's assault of the complainant transpired. According to the complainant's Grand Jury testimony, he had gone to sleep when the defendant and her son were watching t.v. in the living room. He was awoken by her stabbing him in the neck. He further described that during the attack he tried to defend himself by blocking the defendant with his arms. During the attack, he testified that the defendant returned to the bedroom with a second knife and to get a blanket for her son. The police recovered one knife from the floor of the bedroom at the time of their initial response. The complainant's testimony did not include any narrative of events from earlier in the evening or any context concerning the history of the relationship. His Grand Jury testimony comports with his excited utterances to the police upon their arrival on the night of the attack. In the hallway while holding his bleeding head, he can be heard yelling out that he had been attacked in his sleep. Since the People did not call the complainant at the DVSJA hearing, the complainant did not undergo cross examination nor did the Court have an opportunity to evaluate his credibility.
The defendant testified before the Court that her memory of the event was "foggy." She recalled that the complainant had been drinking. The defendant asked the complainant to return the keys to her apartment, seeking, again, for the complainant to move out and leave. The two got into an argument, which eventually became a physical altercation that continued into the bedroom. As the two fought, the defendant took a knife from the dresser. The defendant recalled first taking the knife to scare the complainant, but he "started coming at [her]." The defendant remembered that the complainant punched her in the chest, but did not recall where she stabbed the complainant or how many times. She also remembered falling off the bed and landing on her back when she stabbed him and then passing out. Her son was asleep on the bed, and she and her son were awoken by the sounds of police trying to gain access to the apartment. She testified to her fear and shock. 
This testimony contradicted a videotaped statement the defendant made to a senior prosecutor from the Bronx District Attorney's Office prior to her criminal court arraignment. At a prior pre-trial Huntley hearing, this Court held that the defendant voluntarily waived her Miranda warnings and that the statement would be admissible at trial. The statement lacked any coherent explanation of a motive or any history of intimate partner violence that would have explained the defendant's actions. 
The defendant's lack of transparency could be described as evasive or consistent with a person's reaction to both immediate and past traumas. According to a study conducted by the Centre for Women's Justice, "the inability to remember crucial events can be construed as a strategy — namely, that women remember only what is useful to their case." The report continues, "An inability to remember the event in question can also lead women to give [*5]inconsistent or implausible accounts, for example . . . in the initial police interview" Centre for Women's Justice, Women Who Kill: how the state criminalises women we might otherwise be burying, available at 
https://static1.squarespace.com/static/5aa98420f2e6b1ba0c874e42/t/602a9a87e96acc025de5de67/1613404821139/CWJ_WomenWhoKill_Rpt_WEB-3+small.pdf [last accessed April 28, 2025]). The defendant's distrust and inability to describe specifics relating to traumatic events exhibited itself through her demeanor and omission of salient details while testifying. This affect corroborated the defendant's initial difficulty in speaking to Dr. Akinsulure-Smith and her advocates at STEPS to End Family Violence. Dr. Akinsulure-Smith testified to the defendant's initial reluctance to share details and the March 6, 2025, STEPS to End Family Violence report described the defendant's progress in her ability "to express her feelings." Dr. Akinsulure-Smith also explained that people who experience traumatic events have difficulty recalling them and that avoidance is part of the diagnostic criteria for PTSD.
The medical evidence did little to elucidate the circumstances of how the assault occurred. Dr. Cullin testified that the stabbing caused the complainant to suffer lacerations on his forehead and hand, and puncture wounds on his neck and left upper arm. The puncture wound on the complainant's neck caused lacerations to his thyroid cartilage and left submandibular duct, which is a salivary gland. To cause a penetrating wound to this salivary gland, the knife would have had to penetrate under the mandible and go through skin, fat, and muscle. However, Dr. Cullin could not say with any certainty how the parties would have been positioned for this injury to occur.
Dr. Akinsulure-Smith diagnosed the defendant with PTSD. Her diagnosis stemmed from her clinical interviews with the defendant and the use of two diagnostic instruments: the PCL-5 and the TSI-2. Dr. Akinsulure-Smith noted that, while the defendant had a history of traumatic events, the defendant's most distressing experience was finding herself in a fight with the complainant that led to her stabbing him. In her opinion, the defendant was in "fight, flight, fawn, or freeze mode" and as between these different responses, the defendant had chosen to fight.
Blood tests taken as the complainant was being treated for the stabbing revealed that he had alcohol, marijuana, and benzodiazepines in his system. Dr. Cullin also noted that the complainant appeared to be suffering from macrocytic anemia, a condition involving enlarged red blood cells. Dr. Cullin explained that alcohol abuse by the complainant was the most likely cause of this condition, since the other causes were much rarer, such as the complainant having an underlying bone marrow disorder. 
The complainant's medical records validate some of the behaviors the defendant testified to experiencing with the complainant, particularly his alcohol abuse, his outbursts surrounding food, and verbal abusiveness. A note from February 23, 2022, stated that the complainant was "acutely disruptive, threatening, belligerent, [and] combative with floor staff and [the] trauma team," and was "complaining about food quantity." This dispute escalated to the point where security was called. In a June 3, 2022, note related to his discharge from a subsequent hospitalization for swelling in his legs, the complainant again raised food-related complaints and behaved in an aggressive manner towards hospital staff. According to that note, the complainant expressed concern over being discharged when his legs still appeared swollen. During this subsequent hospitalization, the complainant described himself as homeless. The hospital notes, reinforce that the complainant suffered anxiety from his housing insecurity, and that he was a [*6]verbally abusive, threatening individual.
In addition, prior DIRs of the complainant with a different partner, demonstrated that the complainant's prior relationship shared common threads with what occurred between the parties herein. During an incident in 2017, he refused to leave that partner's home and in a separate report that year the partner alleged that the complainant had been highly intoxicated and threatened her. In 2020, that same partner reported in a DIR that he had come to her home and when refused entrance, repeatedly kicked her door, causing it to become damaged. Police noted on the report that they could not enter the apartment due to the damage to the door.

 Analysis and Sentencing Determination
Penal Law § 60.12 requires that a defendant satisfy three prongs to be eligible for an alternative sentence:
(a) at the time of the instant offense, the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of the same family or household as the defendant as such term is defined in subdivision one of section 530.11 of the criminal procedure law;
(b) such abuse was a significant contributing factor to the defendant's criminal behavior; [and]
(c) having regard for the nature and circumstances of the crime and the history, character and condition of the defendant, that a sentence of imprisonment pursuant to section 70.00, 70.02, 70.06 or subdivision two or three of section 70.71 of this title would be unduly harsh may instead impose a sentence in accordance with this section.
Courts have held that, to obtain an alternative sentence under Penal Law § 60.12, a defendant must establish these prongs by a preponderance of the evidence (see People v Addimando, 197 AD3d 106, 112 [2d Dept 2021]; see also People v Brenda WW., 222 AD3d 1188 [3d Dept 2023], lv granted 2024 NY Slip Op 62891[U] [February 20, 2024]). The parties agree that this Court should apply a preponderance of the evidence standard. The Court discusses each prong in turn and concludes that the defendant has satisfied each by a preponderance of the evidence.
Regarding the first prong, the First Department has interpreted the language "at the time of the instant offense" contained in Penal Law § 60.12 to mandate "a temporal nexus between the abuse and the offense," and has also explained that the necessary temporal nexus requires the "abuse or abusive relationship [to] be ongoing" (People v Williams, 198 AD3d 466, 466 [1st Dept 2021], lv denied 37 NY3d 1165 [2022]). The term "substantial abuse" means just that, and so the abuse cannot be "moderate" or "mundane" (see Brenda WW, 222 AD3d at 1188 [internal quotation marks omitted]; see also People v Galloway, 232 AD3d 477, 477-78 [1st Dept. 2024], lv denied 42 NY3d 1079 [2025]). The statute also requires that the ongoing substantial abuse be inflicted by a member of the same family or household as that term is defined under CPL § 530.11.
The defendant established by a preponderance of the evidence that at the time of the offense she was the victim of substantial abuse inflicted by a member of the same family or household under CPL § 530.11. The parties do not dispute that the defendant and the complainant were in an "intimate relationship" under CPL § 530.11(1)(e). The credible evidence established that the defendant suffered a litany of abuses by the complainant, which were exacerbated by her trauma history. The abuse consisted of unwanted sexual relations, [*7]verbal and emotional abuse, berating her, insulting her weight and using pejoratives like "bitch." He made it known that he could access a gun to harm her, kept knives by the bedside table posing a risk to the defendant and her young son, who was then around three years old. He drank excessively, showed jealousy, and questioned her need to work late. While the complainant continued to reside in the apartment over the defendant's objection, he expected her to pay the rent and utilities, purchase groceries, and then denigrated those efforts such as by insulting and complaining about the meals she prepared. Several forms of abuse testified to by the defendant align with those known to raise the danger of lethality in an intimate partner violence relationship, including: forced sexual relations, access to firearms, history of strangulation, excessive alcohol consumption, and jealousy (see J.B., 83 Misc 3d at 475-76; Campbell, The Danger Assessment: Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide, available at 
https://www.dangerassessment.org/uploads/DA_Validation_of_a_Lethality_Risk_Assessment_Instrument-Campbell.pdf [last accessed April 22, 2025]). 
Finally, the requisite temporal nexus is clear. The significant abuse continued right up until the stabbing itself.
The next factor requires the Court to consider whether the abuse was a "significant contributing factor." The Third Department has interpreted this requirement to mean that the abuse need not be the "sole or even the primary cause" (People v Ava OO., 233 AD3d 1186, 1888 [3d Dept 2024]), and has emphasized that a broad construction ensures that this prong does not collapse into a legal justification or duress requirement (Ava OO., 233 AD3d at 1188; Brenda WW., 222 AD3d at 1188). The Fourth Department has held that "a court should consider the cumulative effect of the abuse together with the events immediately surrounding the crime, paying particular attention to the circumstances under which [the] defendant was living and adopting a full picture approach in its review" (People v Wendy B.-S., 229 AD3d 1317, 1319 [4th Dept 2024], lv denied 42 NY3d 1022 [2024] [internal quotation marks omitted]). The Second Department has also analyzed this prong by considering the "cumulative effect of the defendant's abuse," "the events immediately surrounding the crimes," and "the circumstances under which the defendant was living" (see People v Burns, 207 AD3d 646, 648-649 [2d Dept 2022]).
The abuse suffered by the defendant was a significant contributing factor to her criminal behavior in stabbing the complainant. The credible evidence demonstrated that prior to the stabbing incident, several hallmarks of the complainant's abuse of the defendant were present. The complainant had been drinking. There is credible evidence that at some point on the evening of the attack an argument ensued, because the complainant refused to return the defendant's keys and move out of her apartment. While the defendant's recounting of the attack lacks precise details, her testimony included credible recollections of feeling scared and in shock prior to the attack. Within the context of the parties' history, which included constant belittling of the defendant, unwanted sexual interactions, claims that the complainant could access a gun to kill her, jealousy, and a false report to the police, the Court concludes by a preponderance of the evidence that this factor has been established (see Wendy B.-S., 229 AD3d at 1319; Burns, 207 AD3d at 648-649); see also People v Liz L., 221 AD3d 1288, 1291 [3d Dept 2023]) [prong satisfied in a stabbing where defendant blacked out and could not recall details]).
Finally, the Court must weigh whether the sentence typically mandated under Penal Law §§ 70.02[3][a] and 70.45[2][f]) would be unduly harsh and excessive. "The determination of an appropriate sentence requires the exercise of discretion after due consideration given to, among [*8]other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation and deterrence" (People v Farrar, 52 NY2d 302, 305 [1981]). The DVSJA builds on these considerations by allowing courts to provide compassionate sentencing relief, without diminishing the seriousness of the conduct or suggesting that it was justified (see Brenda WW., 222 AD3d at 1188; Burns, 207 AD3d at 648).
The defendant is before the court convicted of attempted murder in the second degree, a Class B violent felony She faces sentencing as a first-time felony offender. This would normally place her sentencing range at a determinate prison term of between five and 25 years to be followed by two and one-half to five years of post-release supervision (see Penal Law §§ 70.02[3][a]; 70.45[2][f]). Such a sentence would be both unduly harsh and excessive. No evidence elicited at the hearing suggests the complainant suffers from any ongoing medical issues because of the stabbing. While the complainant seeks a state prison sentence for the defendant, victim input is only one factor for the Court to consider. The defendant is a first-time offender with no history of committing criminal acts either violent or non-violent. She has conformed with court orders consistently and worked on therapeutic goals. There is no basis to conclude she poses a risk to community safety.
For the foregoing reasons, the Court finds that the defendant qualifies for alternative sentencing under the DVSJA (Penal Law § 60.12[2][a]).
This constitutes the decision and order of the Court.
Dated: April 29, 2025
Bronx, New York
Audrey E. Stone, A.J.S.C.