People v Terrance S. (2025 NY Slip Op 50429(U))

[*1]

People v Terrance S.

2025 NY Slip Op 50429(U)

Decided on April 2, 2025

Supreme Court, Kings County

Daniels-DePeyster, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 2, 2025
Supreme Court, Kings County

The People of the State of New York

against
Terrance S., Defendant.

Indictment No. 2849-17

For the Defendant: 
Bahar Ansari, Esq. - The Legal Aid Society
Dana Wolfe, Esq. - The Legal Aid Society
Lawrence Hausman, Esq. - The Legal Aid Society 
Lucy Gubernick, Esq. - The Legal Aid Society
For the People:
Lisa Perlman, Esq. - Kings County District Attorney's Office

Claudia Daniels-DePeyster, J.

On April 8, 2017, the defendant, Terrance S.,[FN1]
was arrested and charged with Manslaughter in the Second Degree (PL § 125.20[1]), Operating a Vehicle While Under the Influence of Alcohol (VTL § 1192.3), and other related offenses. The grand jury subsequently indicted the defendant under the instant indictment with 33 counts, including Murder in the Second Degree (PL § 125.25[2]), Operating a Vehicle While Under the Influence of Alcohol (VTL § 1192.3), and other related offenses.
On June 11, 2019, the defendant was sentenced to 15 years of incarceration with five years of post-release supervision following his plea of guilty to Manslaughter in the First Degree (PL § 125.20[1]). He now moves to vacate his sentence pursuant to Criminal Procedure Law ("CPL") § 440.47 and impose a new sentence in accordance with Penal Law ("PL") §60.12.[FN2]
The [*2]Court conducted an evidentiary hearing, during which the defendant called four witnesses and introduced multiple pieces of evidence.[FN3]
 The People called two witnesses and introduced multiple pieces of evidence.
Based upon the testimony at the hearing, voluminous exhibits in evidence, and the applicable law, the defendant's motion is GRANTED.
 I. HEARING TESTIMONY AND EVIDENCE
The record for this hearing is voluminous and detailed. While the court has considered the entire hearing record and all the arguments from both sides, only those portions of the record most relevant to this Court's decision will be discussed herein.
A. Terrance S.
Terrance is 44 years old and originally from Cleveland, Ohio (Feb. 7 Tr. at 306). In support of his motion, Terrance chose to testify on his own behalf.
1. Childhood and Adolescence
When Terrance was three years old, his mother, Vickie, and his father, Thomas, ended their relationship with each other (Feb. 7 Tr. at 306). Terrance remembers their relationship consisted of "a lot of arguing [and] a lot of fighting:" his father yelling at his mother and sometimes slapping and punching her (Feb. 7 Tr. at 306). He described his father as "very mean [and] very loud" (Feb. 7 Tr. at 308).
Terrance explained that he and his father never had much of a relationship (Feb. 7 Tr. at 307). He described how his father denied Terrance was his son from the day he was born, because Terrance "was too dark" (Feb. 7 Tr. at 307). Terrance's mother even had a DNA test done that confirmed paternity, but Terrance's father continued to deny he was his child (Feb. 7 Tr. at 307). Terrance's father constantly reminded him that he thought Terrance was not his son (Feb. 7 Tr. at 308). Terrance described his father as an alcoholic and an addict who was intoxicated around him many times (Feb. 7 Tr. at 306, 308). He said that he could not "describe how awful it was" and that it was a "really bad time" in his life (Feb. 7 Tr. at 308). His father was not financially supportive of Terrance either because "he never really had a job for very long" (Feb. 7 Tr. at 310).
While in high school, Terrance said he was "bullied a lot" for being overweight and because people thought he was gay, though he was not out at the time (Feb. 7 Tr. at 311). They would call him "homo," "faggot," "fat," and "gay" (Feb. 7 Tr. at 311). Because Terrance did not "want to go through any more of the bullying," he signed himself out of high school in July of 1997 and got his GED in October of that same year (Feb. 7 Tr. at 312). Terrance then attended the Ohio Center for Broadcasting (Feb. 7 Tr. at 312).
2. Terrance's Sexuality
Terrance first came out as gay when he was 20 years old, telling friends he went to broadcasting school with: Terrell, Sara, DJ, Sam, and Angel (Feb. 7 Tr. at 313-314; Feb. 26 Tr. at 395). At 22, he came out to his mother and brother, then his aunt and his sister (Feb. 7 Tr. at 314; Feb. 26 Tr. at 395). Terrance's mother said that "she already knew, and that it was okay" [*3]but Terrance said that telling his aunt was "uncomfortable" (Feb. 7 Tr. at 314). Terrance had an uncle who was openly gay, but "a lot of family members didn't agree with his lifestyle and talked about him behind his back a lot (Feb. 7 Tr. at 314-315).
3. Housing
When Terrance first moved to New York, he lived in a single-room occupancy in Flatbush, Brooklyn, through the program CAMBA (Feb. 7 Tr. at 322). The housing was specifically for people with Terrance's medical diagnoses (Feb. 7 Tr. at 322). He lived there for four months until he moved to an apartment at 301 Powell Street in Brownsville, Brooklyn (Feb. 7 Tr. at 323). The apartment was paid through Section 8 and a second housing program (Feb. 7 Tr. at 323, 324; Feb. 26 Tr. at 394-395).
4. Terrance's Relationship with Derrick E.
Terrance met Derrick in April 2015 through a phone chat dating service (Feb. 7 Tr. at 325-326; Feb. 26 Tr. at 408). Terrance described the beginning of their relationship as "good" (Feb. 7 Tr. at 326). He said that they had "smoking marijuana and drinking alcohol" in common, that they "seemed to have fun together," and that he thought Derrick was attractive, "funny, kind of smart, [and] dressed nice" (Feb. 7 Tr. at 326).
a. Derrick Moving in With Terrance
Just after Christmas of 2015, Derrick was on crutches following an injury and told Terrance that "he really needed to live in an apartment on the first floor" and asked Terrance if he could move in (Feb. 7 Tr. at 335; Feb. 26 Tr. at 409). Derrick moved in on January 1, 2016, and according to Terrance, Derrick offered to give him $300 a month for cable and food (Feb. 7 Tr. at 335; Feb. 26 Tr. at 411). Eventually, Terrance did try to "kick Derrick out" of the apartment, but Derrick "threatened to bust out the windows of the apartment," and Terrance was concerned that he would lose his Section 8 if that happened (Feb. 7 Tr. at 364-365; Feb. 26 Tr. at 377). 
b. Physical Abuse
Terrance testified that Derrick was physically abusive throughout their relationship (Feb. 7 Tr. at 344). The abuse, according to Terrance, included punching him in the face or body, slapping in the face, biting, kicking, and pushing (Feb. 7 Tr. at 344, 364; Feb. 26 Tr. at 433). By Early 2017, it had become more frequent (Feb. 7 Tr. at 355-356).
According to Terrance, in August of 2015, he and Derrick were at his apartment, drinking, smoking marijuana, and watching wrestling on TV (Feb. 7 Tr. at 328-329). Terrance and Derrick started to play wrestle, but Terrance said it turned "really serious pretty quickly" when Derrick put Terrance into a chokehold (Feb. 7 Tr. at 329). Terrance was having difficulty breathing (Feb. 7 Tr. at 329). When Derrick did stop choking Terrance, he apologized, said "he was really sorry," and left the apartment (Feb. 7 Tr. at 329). Terrance, however, was still in pain a few days later and went to the emergency room (Feb. 7 Tr. at 329). He told the provider that he injured himself wrestling with his cousin because he did not want to get Derrick in trouble (Feb. 7 Tr. at 330).
In November of 2015, Derrick was at Terrance's house, and they were "smoking and drinking" (Feb. 7 Tr. at 332; Feb. 26 Tr. at 428). Terrance mentioned to Derrick that he wanted to quit smoking cigarettes. Derrick "snatched" the cigarette out of Terrance's hand and pushed him (Feb. 7 Tr. at 332). Terrance fell and hit the "wooden radiator box" between the bed and the wall, hitting his ribs (Feb. 7 Tr. at 332). Terrance lay there for "three or four minutes" to try and catch his breath, and as he lay there, Derrick said he was sorry (Feb. 7 Tr. at 333). Terrance said [*4]his pain level was a 10 out of 10, and he thought he may have broken a rib (Feb. 7 Tr. at 333; Feb. 26 Tr. at 428). Approximately four or five days later, Terrance felt he could stand long enough to take the subway to the emergency room (Feb. 7 Tr. at 333-334). Terrance did not report to the hospital provider or the police what had happened because he "didn't want to get Derrick in trouble" (Feb. 7 Tr. at 334).
Terrance also said that on one occasion, not long after Derrick moved in with him, while Derrick and Terrance argued, Derrick bit Terrance's nose (Feb. 7 Tr. at 343-344, 356). Terrance did not go to the hospital or the police because he did not want Derrick to get arrested (Feb. 7 Tr. at 344). On another occasion, Derrick yelled at Terrance while Terrance's friend Lijah was visiting from Atlanta (Feb. 7 Tr. at 341). They went to the bathroom and Derrick punched Terrance in the face (Feb. 7 Tr. at 341).
c. Psychological Abuse
Terrance explained that he did "most of the cooking" when Derrick moved in, but Derrick was "unhappy" with what he made and would yell that he did not like to eat what Terrance likes to eat, and that Terrance needed to learn to cook what Derrick likes to eat (Feb. 7 Tr. at 336).
According to Terrance, Derrick would also tell him that he "needed to make friends with a better class of people" and that he "shouldn't hang around so many people who have [diseases]" (Feb. 7 Tr. at 337). He also told Terrance that his friend Lucky looked "like he was dying" and that Terrance should not hang around him (Feb. 7 Tr. at 337).
Terrance reported that Derrick would make Terrance go to the gym with him if he was over 175 pounds (Feb. 7 Tr. at 343). Derrick would also call Terrance "nasty, dirty, filthy, or prostitute" (Feb. 7 Tr. at 339; Feb. 26 Tr. at 418). When Terrance got a new car in March of 2017, Derrick told Terrance he did not "deserve such a nice car" (Feb. 7 Tr. at 362; Feb. 26 Tr. at 424).
In early 2017, when Terrance's friend Terrel was visiting from Miami, Florida, Derrick and Terrence argued over food (Feb. 7 Tr. at 342). Derrick told Terrance that he "didn't deserve to eat," "he snatched the food" out of Terrance's hand "and threw it in the garbage" (Feb. 7 Tr. at 342).
5. Terrance's Relationships with Friends and Family
When Terrance first moved to New York, he had "a pretty close relationship" with his immediate family: his mother, brother, and sister (Feb. 7 Tr. at 325-326). Terrance would speak to them over the phone, FaceTime, or text daily (Feb. 7 Tr. at 325). He also had "a good relationship" with his aunt, uncle, and a few cousins (Feb. 7 Tr. at 326). Terrance also kept in touch with his friends Lijah in Atlanta, Terrell in Miami, and Angel in Cleveland through phone calls, text messages, and Facebook (Feb. 7 Tr. at 325).
According to Terrance, Derrick thought he and his family were "too close" and did not want Terrance talking to them for long periods (Feb. 7 Tr. at 338). Derrick would make comments like "Haven't you talked to them enough today," and "It's been five minutes, time to get off the phone" (Feb. 7 Tr. at 338). As a result, Terrance would wait until Derrick was not around to call his family (Feb. 7 Tr. at 338-339). By March of 2017, Terrance was barely speaking to his mother and sister once a week (Feb. 7 Tr. at 357).
6. Relationship with Alcohol
Terrance started to drink alcohol in 1999, when he was around 20 years old, and indicated that he "drank a lot," approximately "three tall cans of beer" "three times a week" [*5](Feb. 7 Tr. at 315; Feb. 26 Tr. at 396). When he was 21, he was arrested for driving under the influence (Feb. 7 Tr. at 315; Feb. 26 Tr. at 398).
When Terrance and Derrick first started dating, Terrance drank "two tall 24-ounce cans of beer" "three times a week" (Feb. 7 Tr. at 351-352). But as their relationship progressed, Terrance "started drinking more to be able to deal with everything that was going on with Derrick" (Feb. 7 Tr. at 352). From January 2017 through Terrance's arrest in April 2017, Terrance was drinking daily. (Feb. 7 Tr. at 353). At that point, he was drinking approximately "three 24-ounce cans of beer, and three or four shots of alcohol" a day and would be drunk by the time Derrick came home from work (Feb. 7 Tr. at 353; Feb. 26 Tr. at 401, 426). Terrance felt he could deal with Derrick better when he was drunk (Feb. 7 Tr. at 354). Even Terrance's mother and sister commented to Terrance that he was drinking more than he typically did and that "they felt that something was wrong" (Feb. 7 Tr. at 364; Feb. 26 Tr. at 425).
7. Terrance's Health Diagnosis
In May 2012, Terrance did a paid focus group for extra money. The focus group involved a health screening, through which he learned of his serious health diagnosis (Feb. 7 Tr. at 317; Feb. 26 Tr. at 403). When Terrance got the news, he recalls seeing a bus coming and feeling like he wanted to step in front of it (Feb. 7 Tr. at 318). Terrance did not feel he could seek support from his friends or family (Feb. 7 Tr. at 318). To this day, the only family member who knows of his diagnosis is his mother (Feb. 7 Tr. at 319). As a result, Terrance "spent a lot of time alone" and thought that he "would be alone forever" (Feb. 7 Tr. at 319). Additionally, Terrance had seen his uncle die from complications from the same disease and recalled seeing his uncle weighing 80 pounds with gray skin and how "people treated him like he had Ebola" (Feb. 7 Tr. at 318).
According to Terrance, he did disclose his medical diagnosis to Derrick before they met in person (Feb. 7 Tr. at 326; Feb. 26 Tr. at 413, 438). Around August 2016, Terrance was not taking his medicine as he was supposed to (Feb. 7 Tr. at 350; Feb. 26 Tr. at 427). This was partially because, according to Terrance, his medication had been stolen twice from the jacket in the closet of the apartment where he kept it (Feb. 7 Tr. at 350-351; Feb. 26 Tr. at 427, 438). Terrance believed Derrick stole it to sell it (Feb. 7 Tr. at 350-351).
8. Terrance's Dog, Koby [FN4]

On the weekend of July 4, 2016, Terrance visited his family in Cleveland and left his dog Koby with Derrick in their apartment (Feb. 7 Tr. at 320-321, 345). At some point during the weekend, Terrance got a text from Derrick saying that he "hated Koby, and Koby is not a good dog; she has been acting up, that she pooped in the apartment, and that she peed in the apartment" and that "he was going to get rid of her" before Terrance got back (Feb. 7 Tr. at 346). The following day, Derrick called Terrance crying, saying that Koby's collar was loose and that she got out and ran away in the rain (Feb. 7 Tr. at 346; Feb. 26 Tr. at 421-422). When Terrance returned on July 5, 2016, he looked for Koby around Brooklyn "just about every day" (Feb. 7 Tr. at 349).
9. Underlying Incident
On April 8, 2017, at approximately 12:30 PM, Terrance walked to the store from his apartment to buy "beers and shots" (Feb. 7 Tr. at 366). He purchased "three 24-ounce cans of [*6]beer and about four shots of alcohol" and drank it all over a two- or three-hour period (Feb. 7 Tr. at 366; Feb. 26 Tr. at 373). Later, around 3:00 or 4:00 PM, Terrance drove 45 minutes to pick up Derrick at his job (Feb. 26 Tr. at 373-374). When they returned to the apartment together, they both drank and smoked marijuana (Feb. 26 Tr. at 374, 430). Terrance said he had another beer and two more shots (Feb. 26, Tr. at 374).
At some point between 6:00 and 7:00 PM, Derrick indicated that he was going to walk to buy some marijuana (Feb. 26 Tr. at 375). Terrance offered to drive him (Feb. 26 Tr. at 375, 431). Terrance described this as "a terrible decision" (Feb. 26 Tr. at 375). As they drove, Terrance and Derrick argued about a picture Derrick had of himself shirtless in his underwear on Facebook (Feb. 26 Tr. at 375-376). They also argued about money (Feb. 26 Tr. at 376). According to Terrance, as the arguing continued, Derrick said that he killed Koby, put her in a bag, and threw her in the trash and that Terrance would never find her no matter how many times he went out looking (Feb. 26 Tr. at 376-378). Terrance was "shocked" and told Derrick he wanted him out of the house (Feb. 26 Tr. at 377). Derrick then proceeded to stab Terrance with a knife through his lip and his nostril (Feb. 26 Tr. at 377).[FN5]

Terrance began to accelerate, wanting to "get away from everything and find something to crash into" (Feb. 26 Tr. at 379). Terrance said that he did not see the man that he hit but remembers feeling someone going under the car and "feeling sick, really sick" (Feb. 26 Tr. at 379, 432). After the crash and the car came to a stop, Terrance got out and saw a man who he asked to hide him from Derrick (Feb. 26 Tr. at 380).[FN6]
He then started walking towards his apartment, called his mother, and left her a voicemail, before being stopped by the police (Feb. 26 Tr. at 380).
As to the events of that day, Terrance said: "I feel terrible. I wish that I could go back and not drive that day, not offer to take him anywhere, and never get in the car and drive drunk as I was. I wish I could take it back" (Feb. 26 Tr. at 381).
10. Terrance's Incarceration
Terrance was at Rikers Island for over two years before taking a plea on this case (Feb. 26 Tr. at 382). Terrance reported that while he was incarcerated there, he was "a serious alcoholic" and had to be put on withdrawal medications (Feb. 26 Tr. at 382).
After his plea and sentence, Terrance was sent to Great Meadow Correctional Facility ("Great Meadow") (Feb. 26 Tr. at 383). At Great Meadow, there were "not very many" programs available to Terrance, and he was told that it was too early in his sentence to take the anger management course, or the alcohol and substance use treatment program (Feb. 26 Tr. at 383). While at Great Meadow, Terrance spoke with his mother twice a week, though there was no privacy on the phone (Feb. 26 Tr. at 383-384). He could also contact a few friends via email (Feb. 26 Tr. at 384). While incarcerated there, he tried to hide the fact that he is gay because [*7]"gay people don't generally do well in prison" (Feb. 26 Tr. at 384-385). Terrance recalled an incident where two other inmates assaulted a man in his 50s because they thought he was gay (Feb. 26 Tr. at 385). Terrance felt unsafe (Feb. 26 Tr. at 384).
Terrance was then transferred to Eastern New York Prison ("Eastern") (Feb. 26 Tr. at 387). There, he had a job working in the metal shop four days a week for 22 cents an hour (Feb. 26 Tr. at 387). While at Eastern, Terrance participated in TAMAR, a program for people who had experienced trauma (Feb. 26 Tr. at 387-388). He spoke with his mother once or twice a week (Feb. 26 Tr. at 388-389). While at Eastern, Terrance was written up once for sleeping past the wake-up bell (Feb. 26 Tr. at 390). This resulted in Terrance being placed in "keep lock" for 15 days, during which he was only permitted to leave his cell for a shower (Feb. 26 Tr. at 390; see Defense Motion Exhibit O — DOCCS Program and Disciplinary Records).
11. Terrance's Mental Health
Terrance reports to have had "depression for a long time and anxiety for a long time" (Feb. 26 Tr. at 390). He reports suffering from "flashbacks of the incident and of the crash" (Feb. 26 Tr. at 391).
12. Terrance's Post-Release Plans
Under his current sentence, Terrance is scheduled to be released in August 2029. Upon his release, he hopes to live in Manhattan, finish his "certification programs for computer school," and "get back into the background acting" (Feb. 26 Tr. at 391). He also said he wants to see a therapist and psychiatrist regularly (Feb. 26 Tr. at 392).
B. Phillip Guttman, Licensed Clinical Social Worker
Phillip Guttman has been a therapist and forensic social worker for approximately 13 years (July 28 Tr. at 33, 40). Based on his training and experience, the Court deemed him an expert in mental health, with an emphasis on Lesbian, Gay, Bisexual, Transgender, Queer ("LGBTQ") clients in the area of treatment and trauma (July 28 Tr. at 56).
1. Misconceptions and Patterns of Domestic Violence
According to Mr. Guttman, domestic violence is often oversimplified (July 28 Tr. at 57). Common misconceptions are that "domestic violence only occurs amongst people who are court involved, or from lower socioeconomic status," and that it only "involves somebody being hit or physically assaulted" (July 28 Tr. at 57). Another common misconception is that "the man is always the perpetrator, and the female is always the receiver of domestic violence" (id.). However, there are similar patterns of domestic violence among straight couples and those in the LGBTQ community. "Some of the patterns would include coercive control, physical abuse, emotional abuse, verbal abuse," exploitation, and financial control (July 28 Tr. at 60-61, 134). It is common for victims of intimate partner violence to minimize their experience, and a victim of same-sex intimate partner violence is even less likely to share their experience with their friends or family (July 28 Tr. at 63-65, 127). In same-sex relationships, it is common for a victim not to share their experience because "[t]here is an embarrassment and a stigma in being gay," and there is "a lot of fear around homophobia. So, asking for help from people or institutions as a gay person is not the same as asking for it as a straight person" (July 28 Tr. at 63). The fear of being outed is a "large factor to consider" as well (July 28 Tr. at 61). As for resources, Mr. Guttman said that in 2017, there were "very few resources available" to someone experiencing same-sex intimate partner violence, and "they weren't well publicized" (July 28 Tr. at 62,63).
2. Domestic Violence and Trauma
Mr. Guttman categorized domestic violence as a form of trauma, specifically, complex [*8]trauma, which is "the multiple occurrences of small traumas over and over, over a longer period of time" (July 28 Tr. at 64-65). He also said that trauma and abuse are strongly linked to substance abuse problems (July 28 Tr. at 64). "[W]hen someone has unprocessed trauma they don't have skills for how to manage" and "drugs and alcohol are often very readily available" as a coping mechanism (July 28 Tr. at 64).
3. Mr. Guttman's Work with Terrance
Mr. Guttman met with Terrance four or five times, the first time being in August of 2018, when Terrance's then-attorney retained him to gather information that could be used for mitigation (July 28 Tr. at 67, 83). Mr. Guttman described Terrance as having "a blunted and restricted affect," a "withdrawn nature, a detached glazed over expression," and "a difficulty in forming broad expressions" (July 28 Tr. at 69, 104, 129). He described Terrance as "subdued and subtle" and "meek in his appearance" (July 28 Tr. at 69). However, in his second report, Mr. Guttman reported that Terrance "showed decent insight in the gravity of the allegations" (July 28, Tr. at 104).
a. Terrance's Childhood
Through their work together, Mr. Guttman learned that Terrance's "tragic childhood" is where his "early complex trauma" began (July 28 Tr. at 69). Terrence reported to Mr. Guttman that he witnessed abuse between his father and mother, ranging from verbal to physical and that "he didn't feel safe at home" (July 28 Tr. at 69-70). Terrence described his father to have a "pretty serious substance abuse problem" (July 28 Tr. at 70). Terrance also reported being bullied as a child, "experiencing issues with weight and body dysmorphia" and that as Terrance got older "he had a lot of shame and embarrassment about his body" (July 28 Tr. at 70).
b. Terrance's Relationship with Derrick E.[FN7]

Mr. Guttman and Terrance discussed Terrance's relationship with Derrick E., which started with "really good chemistry" in 2015 but went "sideways" and "abusive pretty quickly" (July 28 Tr. at 72). There was emotional, mental, and verbal abuse, which escalated to physical abuse (July 28 Tr. at 72-73, 77, 89, 107). Mr. Guttman described the relationship between Terrance and Derrick as "pretty classic in terms of the cycle of violence" (July 28 Tr. at 77). Terrance described it as "a tormenting, teasing [and] bullying" where Derrick would make "insensitive and mean-spirited comments" about Terrance's weight (July 28 Tr. at 73, 75). There was also "coercive control," which consisted of "control of money, a lot of over the top and unreasonable demands about what [Derrick] had expected him (Terrance) to do or not to do, who [Terrance] could talk to or not talk to, where he could go, how he must dress [and] what he could eat or not eat" (July 28 Tr. at 75, 89). The physical abuse included "a lot of punching, hitting, kicking, [and] pushing" (July 28 Tr. at 75).
Mr. Guttman also "communicated with collateral contacts," who described seeing a change in Terrance during relationship with Derrick (July 28 Tr. at 68, 81, 84). Terrance's Mother, Vickie, his sister Endia,[FN8]
and his friend, Terrell, said, "They were concerned and that they noticed that [Terrance had] become more withdrawn, that he was more depressed, that he [*9]wasn't taking care of himself, and that he was drinking more" (July 28 Tr. at 81, 128). Terrance's mother and friend reported "that they did not have a good feeling about the relationship" (July 28 Tr. at 93).
c. Terrance's Health Diagnosis [FN9]

Terrance also suffered trauma because of his health diagnosis and described experiencing "a lot of shame and embarrassment" about his diagnosis (July 28 Tr. at 73-74). Terrance had an uncle who was gay and had the same diagnosis (July 28 Tr. at 74). Terrance recalled that the family shunned his uncle, and this left him with "a lot of painful memories and associations around what his family might think of somebody who [is gay and has that diagnosis]" (July 28 Tr. at 74). According to Mr. Guttman, Derrick threatening to expose Terrance's diagnosis and "tormenting [him] about that, would be really triggering" (July 28 Tr. at 73-74).
d. Terrance's Relationship with Alcohol
According to Mr. Guttman, Terrance reported using alcohol beginning in college, around 18 years old, and that "he had a pretty intense relationship with alcohol pretty quickly" (July 28 Tr. at 72, 99-101). He also said that Terrance was "relying more on alcohol to cope with his negative feelings" while he was in a relationship with Derrick (July 28 Tr. at 78, 82). Terrance "reported that both he and [Derrick] were drinking together [a]nd that when something violent or abusive would happen, that his easiest coping skill, his most available coping skill was to reach for a bottle and pour himself a drink" (July 28 Tr. at 83, 110). Terrance's childhood trauma, "the fact that he was hiding his sexual orientation," coping with his diagnosis, and the death of his grandmother, further fueled his alcoholism (July 28 Tr. at 102-103).
e. Records
Through his work with Terrance, Mr. Guttman reviewed records, including the police reports, Terrance's rap sheet, and hospital records, among others (July 28 Tr. at 68). Mr. Guttman testified that the State University of New York ("SUNY") Downstate medical records contained what he believed to be "symptoms of domestic violence" (July 28 Tr. at 128; see Defense Exhibit B — SUNY Downstate Medical Records). Specifically, Terrance was "showing up at the hospital for [a] non-organic injury" (July 28 Tr. at 129).
f. Mr. Guttman's Conclusions
Mr. Guttman opined that for Terrance, "years of trauma, shame, and alcoholism, coupled with the shame and fear of his diagnosis, which he also kept to himself, made him vulnerable when it came to relationships" (July 28 Tr. at 118). He concluded that Terrance was a victim of intimate partner violence [FN10]
(July 28 Tr. at 91-92, 122-123; see also Defense Motion Exhibit I — Resentencing Mitigation Report of Phillip Guttman at 2).
Mr. Guttman further found that Terrance "qualified for diagnosis under the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") of alcohol use disorder with a severe subtype (July 28 Tr. at 101, 119; see also Defense Motion Exhibit D — Pre-Pleading Investigation of Phillip Guttman at 2-3). He also noted that "the level of intensive therapy and [*10]programming he will require to heal cannot be obtained from within state prison" (July 28 Tr. at 120; see also Defense Motion Ex. I — Resentencing Mitigation Report of Phillip Guttman at 6).
C. Dr. Rachel Lynn Golden
Dr. Rachel Lynn Golden is a licensed clinical psychologist (Nov. 16 Tr. at 145). Based on her training and experience, the Court deemed her an expert in psychology in the areas of complex trauma, intimate partner violence, substance use, and HIV in the LGBTQ community (Nov. 16 Tr. at 160, 178).
1. Misconceptions About Intimate Partner Violence
According to Dr. Golden, there are many misconceptions about intimate partner violence. For instance, people often think that intimate partner violence is only experienced by women and do not assume that men, whether heterosexual, homosexual, or cisgender, could also experience it (Nov. 16 Tr. at 192). People also think, within gay couples, that the aggressor is always the person with the larger body size or the person who is more masculine (Nov. 16 Tr. at 193). She also indicated that there are a lot of stigmas around reporting intimate partner violence and that gay men, in particular, do not want to report because they do not want to be "perceived as weak" (Nov. 16 Tr. at 193; Nov. 17 Tr. at 223). According to Dr. Golden, it is incredibly common for a victim of abuse not to report to police or healthcare professionals because they are worried that they will not be believed (Nov. 16 Tr. at 193 - 195).
2. Trauma and Abuse in the LGBTQ Community
According to Dr. Golden, people in the LGBTQ population "experience higher rates of trauma and abuse, which includes intimate partner violence" (Nov. 16 Tr. at 162). She explained that there are traumatic experiences that are unique to the LGBTQ population. "[T]rauma comes from chronic traumatic societal invalidation, living in an environment that doesn't show you partnerships that look like the ones that you know in your heart, ones that don't give you examples of success, this passive narration that you aren't human, that you aren't enough, then that can also be combined with instances of people telling you that it's bad to be gay it's bad to be queer, you'll never be loved [I]t's really direct and damaging, undermining your ability to be successful as a human because of this part of your identity that you hold" (Nov. 16 Tr. at 182-183).
3. Effects of Trauma
Trauma has a neurobiological effect and impacts how your brain functions (Nov. 16 Tr. at 184). Dr. Golden explained that when people are traumatized, there are "two very disparate ways brains will function" either they "go into overdrive, where they are hyperactive to everything around them or they go into underdrive, where the brain is completely shut down" (Nov. 16 Tr. at 184). Dr. Golden also described a broad range of symptoms of posttraumatic stress disorder ("PTSD"): "bad memories, bad dreams, nightmares, reexperiencing [traumatic experiences]," and hypervigilance (Nov. 16 Tr. at 179-180). She explained that "complex trauma includes all of the PTSD symptoms" and speaks to the way trauma "erodes" other aspects of your life: emotional regulation, the ability to tolerate distress, the ability to find and maintain healthy intimate relationships, and the ability to have effectiveness in negotiating boundaries and safety (Nov. 16 Tr. at 180). Trauma also changes how people interact with others, making them "susceptible to coercion and control" (Nov. 16 Tr. at 185). Complex trauma "makes it difficult for people to respond to new traumatic events with ease and calm" (Nov. 16 Tr. at 186).
4. The Carceral System
"The carceral environment is traumatizing in and of itself," but the lack of treatment and [*11]training in the needs of the LGBTQ populations in the prisons adds to that traumatic situation (Nov. 16 Tr. at 188, 190). The United States prison system "works on a very binary gender system," making it very difficult for someone from the LGBTQ population (Nov. 16 Tr. at 189). Generally, incarcerated people may fear other inmates or corrections officers trying to gain power and control over them (Nov. 16 Tr. at 188). Those in the LGBTQ population are at a greater risk for coercion or control by people "who might be trying to exploit somebody who's hiding their LGBTQ identity" (Nov. 16 Tr. at 189). Therefore, someone who is coming into the carceral system with trauma symptoms, difficulty navigating relationships, "trouble with emotional regulation and trouble tolerating distress trauma is like a tinderbox for having an exacerbation of mental health conditions or creating new ones" (Nov. 16 Tr. at 188).
5. Trauma and Substance Use
According to Dr. Golden, "there is a high correlation between trauma and substance use for coping with trauma" because traumatized individuals use alcohol and drugs to "deal with their symptoms [and] to reduce the harm that they are experiencing from the trauma (Nov. 16 Tr. at 174-175). She indicated that "substance use is extremely high in LGBTQ populations" (Nov. 16 Tr. at 174).
6. Identity Abuse
Dr. Golden defined "identity abuse" as "abuse that is related to some facet of your marginalized or oppressed identity that is targeted towards coercing or controlling you based on the lack of acceptance or liability of something that is truly the core of who you are" (Nov. 16 Tr. at 195). It is the threat of disclosure (Nov. 16 Tr. at 196). In the context of the LGBTQ population, this is often seen where the partner knows the victim's LGBTQ identity, but the victim's family or friends are not aware (Nov. 16 Tr. at 196). The partner would weaponize that knowledge and say, "If you don't do what I want, I'm going to tell, I am going to tell your mom, you wouldn't want this getting out" (Nov. 16 Tr. at 196). There are also threats of the repercussions if their identity is revealed (Nov. 16 Tr. at 196). It is a way to utilize and leverage that identity to have control (Nov. 16 Tr. at 196).
7. Dr. Golden's Work with Terrance
Dr. Golden met Terrance in 2023 (Nov. 16 Tr. at 198). They met for a total of four hours on two dates via video and on a third date for one hour over the phone (Nov. 16 Tr. at 198; Nov. 17 Tr. at 268, 286). Those meetings aimed "to provide a comprehensive psychological evaluation" (Nov. 16 Tr. at 199). Dr. Golden described Terrance as having a "blunted or constructive affect" and a "very limited range of emotions" (Nov. 16 Tr. at 212; Nov. 17 Tr. at 286). She found Terrance to be a reliable reporter, and based on her meetings with him, Dr. Golden found that Terrance had "a long-standing trauma history across his lifetime" (Nov. 16 Tr. at 200; Nov. 17 Tr. at 293). Dr. Golden also reviewed records prepared by Phillip Guttman as well as medical records in her work with Terrance (Nov. 17 Tr. at 295).
a. Terrance's Childhood
Terrance "was rejected by his father, even at birth" (Nov. 16 Tr. at 200). He claimed that Terrance was not his biological son, and even when his mother did a DNA test proving that biological relationship "he still continued to reject him" (Nov. 16 Tr. at 200). Terrance also "experienced his parents' negative relationship," witnessing his father, who abused alcohol and crack cocaine, start fights with his mother (Nov. 16 Tr. at 201).
Terrance also reported extensive bullying, both for his weight and for being gay, which brought him a lot of shame and embarrassment (Nov. 16 Tr. at 201; Nov. 17 Tr. at 278). As a [*12]result of the bullying, Terrance signed himself out of high school and received his GED (Nov. 16 Tr. at 202). Terrance was also worried because he witnessed that his maternal uncle, who was gay, was not accepted or supported by the family (Nov. 16 Tr. at 201). This was a "chronic traumatic invalidation around having a gay identity" (Nov. 16 Tr. at 202).
b. Terrance's Relationship with Derrick E.[FN11]

According to Dr. Golden, Terrance's relationship with Derrick "was a very abusive and controlling relationship, that had all the hallmarks of intimate partner violence" (Nov. 17 Tr. at 219). The relationship was problematic before Derrick moved in. Still, it worsened when he did move in because there was "more access to Terrance" (Nov. 17 Tr. at 220-221). Derrick living with Terrance gave Derrick a greater ability to control Terrance, to restrict his food intake, to control what he was doing, or who he was talking to" (Nov. 17 Tr. at 220). Derrick "critique[d] Terrance for being too thin or being too fat. This brought on some of the trauma he experienced as a child related to weight and bullying" (Nov. 17 Tr. at 227). Terrance reported to Dr. Golden that when he was eating, Derrick would knock food out of his hand. For example, on one occasion, Terrance was eating a lasagna, and Derrick took it from him and said, "You don't deserve to eat," and threw it away (Nov. 17 Tr. at 227).
Derrick used coercive control as well. Dr. Golden defined coercive control as a way of using your language to try and gain power over someone else's thoughts, feelings, or behaviors (Nov. 17 Tr. at 225). Derrick used Terrance's health diagnosis to "belittle him," "malign and harm him," and to "convince him that no one would ever love him" and that "Derrick was the only option" (Nov. 17 Tr. at 224). He even stole Terrance's medication (Nov. 17 Tr. at 225). Derrick threatened Terrance that if Terrance kicked Derrick out of the apartment, he would smash the windows, and he threatened to kill Terrance as well (Nov. 17 Tr. at 225, 226).
Terrence reported to Dr. Golden that the relationship was also physically violent, as Derrick would "push and shove him" (Nov. 17 Tr. at 219, 221). There was one instance, for example, in August of 2015, where Terrance and Derrick were watching TV and wrestling when "playing turned serious suddenly, meaning that Derrick suddenly got very serious about it and had Terrance in a headlock held too tightly or roughly and injured his neck (Nov. 17 Tr. at 221-222). As a result, Terrance went to the hospital, but he told the providers that he hurt himself while wrestling with his cousin (Nov. 17 Tr. at 222-223). Another example was an incident in November of 2015, where Derrick had pushed Terrance, causing him to fall onto a sharp radiator cover (Nov. 17 Tr. at 224).
Terrance also reported to Dr. Golden an incident over the 2016 July Fourth weekend when Terrance visited family out of state and left his dog, Koby, with Derrick (Nov. 17 Tr. at 229). At some point in the weekend, Derrick contacted Terrance to say that "Koby had been bad, pooped and peed on the carpet" (Nov. 17 Tr. at 229). The following day, Terrance got a call from Derrick saying that "Koby had slipped her leash" and run away (Nov. 17 Tr. at 230). Later, Derrick told Terrance that he killed Koby (Nov. 17 Tr. at 230).
Dr. Golden explained that "it's hard to recognize that you're in this situation, it's kind of embarrassing to believe that this is going on and Terrance was doing so much work to hide it from family and friends [H]e was also, essentially, hiding it from himself or not wanted to [*13]recognize it" (Nov. 17 Tr. at 226-227).
c. Terrance's Relationship with Alcohol
Terrance reported that he began drinking around the age of 20 and that a lot of people in his family experienced substance use problems (Nov. 16 Tr. at 202; Nov. 17 Tr. at 276). He also reported that his own drinking "escalated [in quantity and frequency] during the time he was being abused by Derrick" (Nov. 16 Tr. at 202; Nov. 17 Tr. at 251). The drinking escalated from three 24-ounce cans of beer a week before the relationship to that amount of beer, in addition to three to ten shots of liquor, per day (Nov. 17 Tr. at 228, 276). Drinking became a way "to numb and cope with this controlling , distressing, fear-inducing, abusive relationship" (Nov. 17 Tr. at 203, 228-229).
d. Terrance's Relationship with His Family and Their Observations
As part of her evaluation of Terrance, Dr. Golden spoke with his mother, Vickie, and his sister, Endia (Nov. 17 Tr. at 231, 268, 270).
Terrance's mother told Dr. Golden that on one occasion, when she came into town, she saw scratches on Terrance's face and a black eye (Nov. 17 Tr. at 232-233). She also mentioned that Terrance would use filters while on FaceTime "so that it would look like he didn't have bruises or scratches when he would talk to her on the phone" (Nov. 17 Tr. at 233). When his mother would ask Terrance what happened, he would tell her that he "fell down when he was drunk" (Nov. 17 Tr. at 233). Terrance's mother conveyed that she was worried that Terrance was being "controlled by Derrick because of the change in their phone conversations" (Nov. 17 Tr. at 233-234, 299). She also said that Terrance "was drinking more" as a way "to cope" and that she felt that "she was watching it deteriorate him" (Nov. 17 Tr. at 255, 281, 295).
Terrance's sister reported to Dr. Golden that "she and her brother had been very close" and that they would talk multiple times a week, but that "their conversations became less frequent" when Terrance was in a relationship with Derrick (Nov. 17 Tr. at 234-235). She reported that on one occasion when she went to visit Terrance while Derrick was living with him, "she heard them get into a physical altercation in the kitchen" and that she heard what sounded like Terrance "being shoved against a wall" (Nov. 17 Tr. at 235, 269, 294). She also reported that "there was a day when she could see bite marks on his nose" (Nov. 17 Tr. at 235, 294)
e. Terrance's Incarceration
Dr. Golden noted that Terrance's current source of anxiety is the fear of anyone in prison learning of his health diagnosis or that he is gay (Nov. 16 Tr. at 205, 208, 235). Terrance has also had to endure homophobic and harmful language from other inmates and people in the facility (Nov. 16 Tr. at 208). But Terrance explained that he frequently had to agree with the talk and to "pretend that he is not gay in order so that he won't get hurt or won't get victimized by the people around him" (Nov. 16 Tr. at 209; Nov. 17 Tr. at 236). Terrance reported seeing another inmate beat up by other inmates simply for being more female presenting (Nov. 16 Tr. at 208; Nov. 17 Tr. at 236).
During his incarceration, Terrance "gets five minutes with a psychiatrist" once every three months, and once a month he gets approximately 30 minutes with a mental health counselor (Nov. 16 Tr. at 212). Dr. Golden says this is inadequate for Terrance (Nov. 17 Tr. at 238). According to Dr. Golden, Terrance's incarceration has "completely stalled" his ability to process his relationship with Derrick (Nov. 17 Tr. at 250). Terrance does not have "any recourses or therapeutic or community support with whom to process everything that went on" [*14](Nov. 17 Tr. at 250-251). Terrance has no community, and having an "LGBTQ community that accepts you has a tremendously protective effect on mental health and well-being" (Nov. 16 Tr. at 211; Nov. 17 Tr. at 251).
f. Remorse
Terrance demonstrated that he was remorseful for the events of April 8, 2017 (Nov. 17 Tr. at 267). "He said he was very sorry for the harm that he caused to other people because of his actions when he was trying to fight Derrick off inside the car (Nov. 17 Tr. at 267).
g. Dr. Golden's Conclusions
Based on her work with Terrance, Dr. Golden made the following conclusions.
i. Diagnosis
Dr. Golden diagnosed Terrance with PTSD with panic attacks, major depressive disorder, generalized anxiety disorder, and alcohol use discord in remission (Nov. 16 Tr. at 204, 210). She also identified Terrance as "a victim of intimate partner violence" (Nov. 17 Tr. at 235).
ii. Treatment
Dr. Golden concluded that continued incarceration for Terrance would "negatively impact his mental health" (Nov. 17 Tr. at 250-251). According to Dr. Golden, an appropriate treatment plan for Terrance would include "variable trauma, informed sexual orientation affirming therapy multiple times a week" as well as cognitive processing therapy, Eye Movement Desensitization and Reprocessing ("EMDR") and Dialectical Behavior Therapy ("DBT") (Nov. 17 Tr. at 237). Cognitive processing therapy addresses "maladaptive cognitions that occur due to prolonged and complex trauma" (Nov. 17 Tr. at 237). Through DBT, Terrance "would be able to learn coping skills that are [really] appropriate to be used in all sorts of distressing and upsetting situations where he might be feeling emotionally dysregulated (Nov. 17 Tr. at 238). EMDR is a process through which you visualize prompts to allow you to access trauma in a safer way (Nov. 17 Tr. at 237).
iii. Underlying Incident
According to Dr. Golden, "there were [a] myriad [of] factors" that went into forming Terrance's actions inside the vehicle on April 8, 2017 (Nov. 17 Tr. at 264). Dr. Golden indicated that Terrance's initial trauma response was to fight back, but that then "he tried to flee the situation by pressing on the gas pedal" (Nov. 17 Tr. at 264). She also opined that Derrick's abuse of Terrance was "the significant contributing factor to him having consumed that much alcohol" on April 8, 2017, and a significant contributing factor to Terrance's response to Derrick's aggression on that day (Nov. 17 Tr. at 265-266).
D. Derrick E.[FN12]

Derrick E. is a 36-year-old who works in security (May 1 Tr. at 39). He met Terrance in April 2015 through a phone chatline (May 1 Tr. at 42-43; July 7 Tr. at 15). According to Derrick, they "had sex the day [they] met" but were only friends (May 1 Tr. at 44; July 7 Tr. at 27-30). As the year progressed, they would see each other "sometimes three times a week" (May 1 Tr. at 46). When they would see each other, they would watch TV, smoke marijuana, and drink (May 1 [*15]Tr. at 47).
1. Terrance's Friends and Family
Derrick said he only met two of Terrance's friends while they were together (May 31 Tr. at 15; July 7 Tr. at 57), one of whom was named Steven (May 31 Tr. at 15, 31). Derrick denied ever meeting Terrance's mother, sister, or friends, Angel, Lijah, or Terrel (May 31 Tr. at 16-17; July 7 Tr. at 58-61, 64).
2. Terrance's Medical Diagnosis
Derrick denies knowing anything about Terrance's medical diagnosis when they first met (May 1 Tr. at 46; July 7 Tr. at 25-26). According to Derrick, in October of 2015, he went to a doctor to check himself, showed his results to Terrance, and told Terrance to get tested as well (May 1 Tr. at 48-49; July 7 Tr. at 41). Around February 2016, Derrick sent Terrance to the clinic to get tested (May 1 Tr. at 55). Terrance returned from the clinic and told Derrick about his diagnosis, "apparently, he found out that day" (May 1 Tr. at 55; July 7 Tr. at 34-35). Terrance was "freaking out" and seemed "really sad and depressed," "crying and acting devastated" (May 1 Tr. at 56; May 31 Tr. at 7). Getting this news, Derrick says he left, went to the store, and called his mother (May 1 Tr. at 57). When he returned to the apartment, he told Terrance that he would not leave and that they would go to the doctor to find out what the situation was (May 1 Tr. at 58).
According to Derrick, in August of 2017, while working security at a CAMBA location, he looked into the system and learned then that Terrance had been previously living in housing specifically for people with his diagnosis and realized that Terrance must have known about his diagnosis before they met (May 31 Tr. at 71-75; July 7 Tr. at 35-37).
Derrick denied ever stealing Terrance's medication (May 31 Tr. at 31).
3. Allegations of Abuse
Derrick admitted that he and Terrance "argued a lot" (May 31 Tr. at 35). But according to Derrick, Terrance initiated the arguments (May 31 Tr. at 35). Derrick denied ever commenting on Terrance's physical shape, fitness, or eating habits (May 31 Tr. at 34-35). He also denied berating him over his weight or his medical diagnosis (May 31 Tr. at 35). Derrick denied ever demanding or requesting Terrance cook for him (May 31 Tr. at 19).
Derrick did, however, testify to some physical altercations between the two. According to Derrick, on one occasion, during an argument, Terrance got mad and punched Derrick in the face and Derrick punched him back (May 31 Tr. at 36-37). Terrance then bit Derrick's finger, and Derrick bit Terrance's nose (May 31 Tr. at 37). On another occasion, Terrance wanted to have sex, but Derrick did not, and an argument ensued (May 31 Tr. at 38). According to Derrick, Terrance threw a plate at Derrick, threw him against the wall, and shoved him on the couch (May 31 Tr. at 38). Derrick punched and kicked Terrance off (May 31 Tr. at 38).
Derrick said that in November of 2015, "something seemed wrong" with Terrance and that when he asked Terrance what happened, Terrance said, "he got into a tussle [with Charles], he hit his back on the radiator and went to the emergency room" (May 1 Tr. at 50). According to Derrick, Charles told him that he hit Terrance and that Terrance "fell or he kicked him back into the radiator" (May 1 Tr. at 51). Derrick denied pushing Terrance into the radiator (July 7 Tr. at 52-55).
4. Living Situation
Starting January 1, 2016, Derrick was staying with Terrance following an injury to his ankle (May 1 Tr. at 51, 52; July 7 Tr. at 43-44). Derrick described Terrance's apartment as a [*16]"real small studio" on the first floor (May 1 Tr. at 45; May 21 Tr. at 8). Derrick understood Terrance had Section 8 (May 31 Tr. at 9). Derrick denies that he was actually living there during those first three weeks of January (May 1 Tr. at 52; July 7 Tr. at 45). But after Terrance's diagnosis, Derrick said, he "started living there got a copy of the keys [and] started helping with the bills" (May 1 Tr. at 59). He decided to move in because he was in the process of looking for a room, Terrance's lights and cable were being turned off, and Terrance did not have money for the gas (May 1 Tr. at 60; May 31 Tr. at 29; July 7 Tr. at 42).
5. Alcohol and Substance Use
Derrick described his drinking around the time he was dating Terrance as social and "an occasional thing" where he would have maybe two glasses (May 31 Tr. at 19). According to him, neither he nor Terrance drank to excess, and he never saw Terrance drunk (May 31 Tr. at 20, 39; July 7 Tr. at 87-88, 101).[FN13]

6. Terrance's Dog, Koby
According to Derrick, he played a role in caring for Terrance's dog, Koby: paid for her to get her shots and tracker, bought her a leash and bed, and walked her (May 31 Tr. at 20-22, 26; July 7 Tr. at 65-66). In June 2016, Derrick said Terrance went to Cleveland for a week and left Koby with him (May 31 Tr. at 23). During that week, Derrick was walking Koby, and Koby got away and "ran through some bars in the playground" (May 31 Tr. at 23-24). Derrick said he and a friend looked for Koby for 12 hours but were "never able to get her back" (May 31 Tr. at 24-27). Derrick said that after he told Terrance what happened, Terrance "was sad" but "didn't show anger towards [him]" (May 31 Tr. at 27). About one month later, during an argument, Terrance accused Derrick of either losing Koby on purpose, selling her, or killing her (May 31 Tr. at 28). Derrick denied killing Koby (July 7 Tr. at 103)
7. The Underlying Incident
On April 8, 2017, Terrance picked up Derrick from work at approximately 4:00 PM (May 31 Tr. at 41). According to Derrick, Terrance then asked Derrick for money, and when Derrick refused, an argument ensued (May 31 Tr. at 42). They argued until they reached the house, where the argument continued (May 31 Tr. at 42-44). Derrick said he did not see Terrance drink any alcohol at that point in the house, but that Terrance opened a beer and threw it at him (May 31 Tr. at 43-44; July 7 Tr. at 98). However, after questioning by the defense, Derrick admitted that he testified in the grand jury that he had seen Terrance drink a beer (July 7 Tr. at 97-98). Derrick denied drinking anything that day himself (May 31 Tr. at 45; July 7 Tr. at 70). However, it was elicited that in the grand jury, Derrick testified that he "had some Moscato" (July 7 Tr. at 70-71)
Later, around 6:00 or 7:00 PM, Derrick indicated that he was going to purchase marijuana, and Terrance offered to drive him, though it was only "a couple of blocks away" (May 31 Tr. at 45; July 7 Tr. at 72). On the drive, Terrance brought up a picture that Derrick had of himself in his underwear on Facebook and Derrick told Terrance that he would not take it down (May 31 Tr. at 46; July 7 Tr. at 72). Derrick got out of the car, bought the marijuana, got [*17]back in the car with Terrance, and they continued to argue (May 31 Tr. at 46). According to Derrick, they argued about Derrick not having sex with Terrance, and Terrance said that "he was going to burn the building down," that he "was going to kick [Derrick] out," and that Derrick "was going to be homeless" (May 31 Tr. at 47).
When their car reached a red light, according to Derrick, Terrance punched Derrick in the face (May 31 Tr. at 47-48, 55). In response, Derrick said he laughed, said "pathetic," and that they "were not going to fight outside" (May 31 Tr. at 47). Terrance then punched Derrick again (May 31 Tr. at 47; July 7 Tr. at 102). Derrick testified that he punched Terrance back, removed his seatbelt and slid into the back of the car (May 31 Tr. at 47, 55-58; July 7 Tr. at 102). From the back seat, Derrick punched Terrance, but Terrance bit Derrick's finger (May 31 Tr. at 47, 59). Derrick punched Terrance "a couple of times" and tried to "pry" his finger our of Terrance's mouth and Terrance then bit Derrick's leg getting a mouth full of his jeans (May 31 Tr. at 47, 59; July 7 Tr. at 73-74). Derrick denied kicking Terrance, but it was elicited that he told Detective Michael Murphy that he did kick Terrance (July 7 Tr. at 74-75). However, when testifying at a later point in the hearing, Derrick said that Terrance bit his leg when he slid to the back of the car, that he tried to kick Terrance, and that Terrance bit his jeans and then bit his finger (July 7 Tr. at 102).
According to Derrick, Terrance said he was going to kill them both and crash the car (May 31 Tr. at 48, 60-62). According to Derrick, Terrance then "hit the gas," so Derrick put his seatbelt back on (May 31 Tr. at 61-63). Derrick claimed that he did not remember anything from the point when Terrance "hit the gas" to the actual crash because he was "unconscious" (May 31 Tr. at 71). Following the crash, someone opened the car door for Derrick so he could get out of the back seat (May 31 Tr. at 66). Once he got out, he started screaming, "He tried to kill me" (May 31 Tr. at 66, 68).
C. Terrell Forney
Terrell Forney has known Terrance since 1998 (Sept. 27 Tr. at 5, 39). They met at the Ohio Center for Broadcasting (Sept. 27 Tr. at 5-6, 39). He described Terrance as having a "good sense of humor," "very approachable, nice, kind, and very hard-working" (Sept. 27 Tr. at 6). According to Terrell, he and Terrance remained "very, very good friends" even when they both lived in Florida and when Terrance moved to Georgia (Sept. 27 Tr. at 7-8, 43-45). Once Terrance moved to New York, they would stay "in touch through phone calls, text messages, [and] sometimes sharing GIFs on social media" (Sept. 27 Tr. at 9). They would communicate weekly (Sept. 27 Tr. at 9-10). However, Terrell said they started communicating less frequently once Derrick moved in with Terrance (Sept. 27 Tr. at 16, 18, 48).
1. Terrell's Interactions with and Observations of Derrick
According to Terrell, when he would speak on the phone with Terrance, he heard arguing and heard "Derrick urging Terrance to get off the phone" (Sept. 27 Tr. at 16, 51, 53). On one occasion, while on the phone with Terrance, Terrell "heard something crash in the background" and when he asked Terrance about it, Terrance said Derrick had thrown something at him (Sept. 27 Tr. at 17-18).
In June 2016, Terrell came to New York to visit Terrance and stayed the weekend at his apartment (Sept. 27 Tr. at 23-29, 48; see Defense Exhibits K, L). He described the weekend as "eye-opening" and "uncomfortable" (Sept. 27 Tr. at 32). He said that "being in that same space opened [his] eyes a little bit to just the dynamics of how they (Terrance and Derrick) interacted with each other and their relationship" (Sept. 27 Tr. at 32). He said that the relationship did not [*18]appear to be a healthy one (Sept. 27 Tr. at 32). He described hearing Derrick yell at Terrance, "You don't deserve to eat" (Sept. 27 Tr. at 33).
2. Terrance's Relationship with Alcohol
Terrel said that in the early days of his friendship with Terrance, they would go out and drink, and that Terrance would sometimes get drunk (Sept. 27 Tr. at 20). He estimated that Terrance would have four or five drinks but that "maybe once every other month" Terrance would "overdo it" (Sept. 27 Tr. at 20-21). However, according to Terrell, Terrance seemed to be drinking more often once he was in the relationship with Derrick (Sept. 27 Tr. at 21). He noticed that Terrance had slurred speech when they spoke on the phone (Sept. 27 Tr. at 22, 49).
F. Clive Thomas
Sergeant Clive Thomas has been with the New York City Police Department ("NYPD") for approximately 18 years and is currently a supervisor in the Technical Assistance Response Unit (Aug. 13 Tr. at 9). Based on his training and experience, the Court deemed Sergeant Thomas as an expert in vehicular collision (Aug. 13 Tr. at 15).
On April 8, 2017, Sergeant Thomas was "involved in an investigation into a vehicle collision and fatality in the area of Powell Street" (Aug. 13 Tr. at 16). According to Sergeant Thomas, "It was a vehicle traveling at a very high rate of speed, struck a roller skater struck an additional vehicle carrying a passenger in the back who was also pregnant" (Aug. 13 Tr. at 16; 36). The skater died and the pregnant woman lost her unborn child (Aug. 13 Tr. at 17, 26-27). Based on his investigation, Sergeant Thomas determined that the vehicle was in "sports mode," traveling at approximately 90 miles per hour, with the throttle at 100% and zero application on the brakes (Aug. 13 Tr. at 20, 27, 39-45; see People's Exhibit 1 — 9).

II. CONCLUSIONS OF LAW
In 2019, the New York State Legislature enacted the Domestic Violence Survivors Justice Act ("DVSJA"), which the Governor subsequently signed into law. This legislation amended PL § 60.12 and introduced CPL § 440.47, granting courts the discretion to impose alternative, less severe sentences for eligible defendants who are survivors of domestic violence.
A currently incarcerated domestic violence victim may apply for resentencing under CPL § 440.47 if the individual was sentenced before the effective date of the statute to a term of imprisonment of at least eight years and otherwise meets the specific criteria outlined in PL § 60.12. The application for resentencing "must include at least two pieces of evidence corroborating the applicant's claim that [the applicant] was, at the time of the offense, a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of the same family or household as the applicant" (CPL § 440.47[2][c]). One piece of evidence must include "either a court record, pre-sentence report, social services record, hospital record, sworn statement from a witness to the domestic violence, law enforcement record, domestic incident report, or order of protection" (CPL § 440.47[2][c]). In considering such an application, a "court shall conduct a hearing to aid in making its determination of whether the applicant should be resentenced in accordance with [PL § 60.12]" (CPL 440.47[2][e]). On the other hand, an applicant's failure to comply with the requirements of CPL § 440.47 shall result in dismissal of the application without prejudice (CPL § 440.47[2][d]).
Pursuant to PL § 60.12 (1), a court may apply an alternative sentencing scheme where it determines, following a hearing, that:
(a) the defendant was a victim of domestic violence at the time of the offense, subjected to substantial physical, sexual, or psychological abuse by a member of the same family or [*19]household...
(b) such abuse was a significant contributing factor to the defendant's commission of the offense; [and]
(c) Upon consideration of the nature and circumstances of the crime, as well as the history, character, and condition of the defendant, the original sentence imposed was unduly harsh. "By their nature, these criteria are subjective and require a highly individualized determination.
The burden of proof rests upon the applicant to prove by a preponderance of the evidence (People v. Addimando, 197 AD3d 106, 112 [2d Dept. 2021]). The preponderance of the evidence standard requires enough evidence to "produce a reasonable belief in the truth of the facts asserted" (Jarrett v. Madifari, 67 AD2d 396, 404 [1st Dept. 1979] [internal quotation marks omitted]; 8 Carmody-Wait 2d § 56:14 ("A party who has the burden of proof by a preponderance of the evidence must prove his or her contention by the greater weight of evidence")).
The scope of a DVSJA hearing is broad: "[t]he court may consider any fact or circumstances relevant to the imposition of a new sentence which is submitted by [either party]" (CPL § 440.47[2][e]). Courts are directed to consider the "full picture" and all the circumstances facing the defendant (NY Senate, Regular Sess., Mar. 12, 2019, Tr. at 1569-1574). At the hearing, "the court shall consider oral and written arguments, take testimony from witnesses offered by either party and consider relevant evidence to assist in making its determination" (PL § 60.12[1]). Reliable hearsay is admissible (PL § 60.12[1]). Hearsay is reliable if, "based on the circumstances surrounding the development of the proof, a reasonable person would deem it trustworthy" (People v. Mingo, 12 NY3d 563, 564 [2009]).
A. Prong 1: The Defendant Was a Victim of Domestic Violence at The Time of The Offense, Subjected to Substantial Physical, Sexual, Or Psychological Abuse by A Member of The Same Family or Household.
As to the first prong, the defendant must establish that he was "a victim of domestic violence at the time of the offense, subjected to substantial physical, sexual or psychological abuse by a member of the same family or household" (PL § 60.12[1][a] (emphasis added)).
Although the DVSJA does not require that the abuse occur simultaneously with the offense, there must be a temporal nexus between the abuse and the offense (see People v. Williams, 198 AD3d 466, 466-467 [1st Dept. 2021]; see People v. Liz L., 221 AD3d 1288, 1290 [3rd Dept. 2023] ("legislative history makes it clear that the DVSJA was enacted to address shortfalls in each of those defenses, as victims of abuse may not be psychologically or socially capable of invoking such defenses at the time of their trials, due to their victimization and its impact on them" [internal citations and quotations omitted]; see e.g. People v. Fisher, 221 AD3d 1195 [4th Dept. 2023]).
The legislature did not define "substantial." The American Heritage Dictionary defines "substantial," in relevant part, as "considerable in importance, value, degree, amount, or extent;" see also People v. Brown, 214 AD3d 823, 825 [2d Dept. 2023] ("the plain meaning of the statutory text is the best evidence of legislative intent")). Therefore, to show "substantial" physical, sexual, or psychological abuse within the meaning of PL § 60.12, "a defendant must prove abuse of a kind, degree, and severity which is considerable in quantity and significantly great" (People v. B.N., 79 Misc 3d 740, 758 [Sup. Ct. Cayuga Co. 2023]).
Here, the Court finds that the defendant demonstrated by a preponderance of the evidence [*20]that he was "the victim of domestic violence at the time of the offense, subjected to substantial physical, sexual or psychological abuse by a member of the same family or household" (PL § 60.12[1][a]).
First and foremost, two experts opined that Terrance was a victim of intimate partner violence (July 28 Tr. at 91-92, 118, 122-123; Nov. 17 Tr. at 235; see also Defense Motion Exhibit I — Resentencing Mitigation Report of Phillip Guttman at 2).
Both empirical and anecdotal evidence indicates that the violence itself, its cycle, its effects, and its prevalence appear to be virtually identical for both heterosexual and homosexual victims. Victims of same-sex domestic violence, however, face their own set of concerns not shared by victims of heterosexual domestic violence, ranging from specialized forms of abuse unique to same-sex relationships to inadequate access to social services. Unique forms of abuse available only against same-sex or transgender domestic violence victims include outing or threatening to out a partner; reinforcing fears that no one will help a partner because the partner is lesbian, gay, bisexual, or transgender, or that for this reason, the partner deserves the abuse; justifying the abuse by convincing a partner that the conduct is not domestic violence because it is occurring between LGBT individuals; and portraying the violence as mutual and even consensual. Also, given the prevalence of HIV and AIDS in the LGBT communities, abusers may take advantage of and utilize the stigma attached to the disease by, for example, threatening their partner's HIV positive status; withholding, hiding, or discarding their partner's medication; or if the abuser is HIV positive, threatening to or actually infecting their partner (§ 1:8. Defining domestic violence—Same-sex, transgender domestic violence, Domestic Violence Practice and Procedure § 1:8 [internal citations omitted]).
Terrance's experience aligns precisely with this explanation. He endured the same cyclical violence, effects, and prevalence described here, but also faced the distinct challenges unique to same-sex domestic violence. Like many LGBTQ victims, he encountered abuse that leveraged his identity against him. Additionally, barriers to support and inadequate access to resources compounded his struggles, mirroring the systemic obstacles outlined in this passage.
Terrance's allegations of abuse were also corroborated by various witnesses in the record (see e.g., People v. DM, 72 Misc 3d 960 [Sup. Ct. Queens Co. 2021] (photographs of defendant's injuries were offered into evidence; defendant reported to the police that she was attacked); cf. People v. JM, 84 Misc 3d 201 [Co. Ct. Orange Co. 2024]).
In her affidavit, Terrance's mother, Vickie, stated:
When Terrance would come home to Ohio, I saw bruises and scratches on him. Terrance would tell me that he had fallen down while drinking, but the injuries did not look to me like what would happen if someone fell down on concrete. I recall one injury in particular that looked like someone had dug their fingernails into Terrance's face. I suspected it might have been Derrick. But whenever I asked Terrance if anyone was hurting him, Terrance dismissed my questions and told me that he would not let anyone hurt him. I noticed changes in Terrance's behavior and demeanor (Defense Motion Exhibit J — Affidavit of Vickie ¶ 20-21).
She went on to say, "I also noticed a change in the way that Terrance drank alcohol in the time that he was with Derrick. Terrance seemed to be drinking more. When he would call me, [*21]his voice sometimes sounded slurred. When he came home to visit, he drank a great deal and seemed depressed. Terrance was not the same person. He was sad during his relationship with Derrick" (id. at ¶ 22).
Terrance's sister, Endia, stated through her affidavit that she and Terrance would talk regularly, and that the more she heard about Terrance's relationship with Derrick, she felt that "Derrick was jealous and controlling" (Defense Motion Exhibit K — Affidavit of Endia at ¶ 12). Endia said, "Terrance would tell me about the fights that he and Derrick had. I recall one fight that started over something small but escalated. I remember Terrance telling me that Derrick pushed his head back during the fight. Terrance told me that Derrick then bit his nose. Terrance and I did a Facetime call after this fight. Terrance had black marks around his nose from where Derrick had bit him" (id. at ¶ 13). She also discussed her April 2016 trip to New York where during her stay at Terrance's apartment, where she "heard Derrick and Terrance get into a fight" (id. at ¶ 14). Endia also asserts that the day prior to the incident Terrance told her that he was "worried that Derrick was going to kill him" (id. at ¶ 16).
Terrance's friend, Lijah, also submitted an affidavit (Defense Motion Exhibit L — Affidavit of Lijah). She states that one evening during her trip, "Derrick and Terrance got into a fight with each other . Derrick and Terrance went into their bedroom where the verbal fight continued. I heard the fight become physical. I heard things being banged around. Derrick told Terrance, 'you're gonna make me kill you'" (id. at ¶ 13). Feeling uncomfortable in the situation, she left the apartment.
Terrance's friend, Angel, corroborated that he and Terrance would speak on the phone nearly daily prior to Derrick moving in with Terrance, but that once Derrick moved in, Angel and Terrance would speak only once a week and he "could sometimes hear Derrick in the background trying to get Terrance off the phone" (Defense Motion Exhibit M — Affidavit of Angel at ¶ 15).
Terrance's allegations of abuse were also corroborated by the testimony of his friend, Terrell (discussed supra; see Defense Motion Exhibit N — Affidavit of Terrell Forney).
The Court does not credit the testimony of Derrick. Derrick's testimony was inconsistent with the testimony of multiple witnesses and affidavits submitted on behalf of the defendant. For example, while Derrick denied ever meeting Endia, Lijah, or Terrell, all three swore to having met him. Derrick's testimony that he never saw Terrance drunk was also inconsistent with the testimony of multiple witnesses who swore to observing Terrance's increasing drinking in addition to instances of slurred speech. This is also inconsistent with his testimony related to his own drinking. Derrick's testimony was that he drank occasionally. But Terrance testified that he and Derrick had drinking and smoking marijuana in common. In fact, during cross-examination, defense presented Derrick with his own multiple social media posts about drinking and celebrating. His testimony was also inconsistent with itself, giving testimony at the hearing that differed from his testimony in the grand jury and the information he provided to detectives. Portions of his testimony were implausible, unbelievable and ultimately incredible,.
Derrick's demeanor and attitude throughout his testimony at the hearing was aggressive, combative, and often disrespectful. Such behavior in a court of law would only lend one to imagine what his attitude and behavior was like when he was alone with Terrance. Even if any of Derrick's testimony was given credit, and the Court determined that Terrance was physical with Derrick, a mutually abusive relationship "does not foreclose a determination that [the] defendant was a victim of abuse" (People v. Brenda W.W., 22 AD2d 1188 [3rd Dept. 2023]).
Accordingly, the Court finds that the defendant did sufficiently establish that he was subjected to substantial physical, emotional and psychological abuse in various forms, throughout his relationship with Derrick and that such abuse was ongoing at the time of his criminal behavior.
B. Prong 2: Such Abuse Was a Significant Contributing Factor to The Defendant's Commission of The Offense
As to the second prong, the defendant must establish that "such abuse was a significant contributing factor to the defendant's commission of the offense" (PL § 60.12[1][b] (emphasis added)). However, "the defendant need not establish that the abuse [s]he suffered was the exclusive, or even the overriding factor to her [his] criminal conduct, but it still must be a significant contributing factor, not simply a mere factor" (People v. A.L., 221 NYS3d 902 [Sup. Ct. NY Co. 2024] [internal citations and quotations omitted]; see also People v. D.M., 72 Misc 3d 960, 966 [Sup. Ct. Queens Co. 2021]). The abuse must have been "of a noticeably or measurably large amount, and it must have played a significant part in making the defendant's criminal behavior happen" (People v. B.N., 79 Misc 3d at 768 [internal dictionary quotations omitted]).
"A court's evaluation with regard to whether the abuse a defendant suffered constitutes a significant contributing factor to [his or] her criminal behavior is not transactional. It is cumulative, requiring the court to consider the cumulative effect of the abuse together with the events immediately surrounding the crime, paying particular attention to the circumstances under which the defendant was living" (People v. Smith, 69 Misc 3d 1030, 1038 [Co. Ct. Erie Co. 2020]; see People v. Burns, 207 AD3d 646, 649 [2d Dept. 2022] (determining the cumulative effect of abuse together with surrounding circumstances); Addimando, 197 AD3d at 116 (considering the detailed history of repeated abuse and ongoing impact of such abuse)). 
"Research has shown that domestic violence exacts a heavy psychological toll on its victims, impacting their states of mind, making them 'hypervigilant to cues of impending danger' that would go unrecognized by someone who had not suffered abuse, increasing their perception of danger and causing them to act impulsively" (People v. Smith, 69 Misc 3d 1030 [Co. Ct. Erie Co. 2020] (citing Lenore E.A. Walker, Battered Women Syndrome and Self Defense, 6 Notre Dame J.L. Ethics Pub. Policy 321, 328 [1992])).
This is mirrored by Dr. Golden's conclusions that Terrance's initial trauma response was to fight back (Nov. 17 Tr. at 264). But most importantly, she opined that Derrick's abuse of Terrance was "the significant contributing factor to him having consumed that much alcohol" on April 8, 2017, and a significant contributing factor to Terrance's response to Derrick's aggression on that day (Nov. 17 Tr. at 265-266; cf. People v. Angela V.V., 229 AD3d 955 [3rd Dept. 2024]). Similarly, Mr. Guttman stated: "There is no doubt in my mind that the stress, the trauma, the day-to-day fear experienced by Mr. S[ ] in his former relationship in April 2017, heavily factored into the terrible car accident, heavily factored into Mr. S[ ]'s alcohol use which we all understand played a horrific role in this accident and even heavily factored into his fear-based response to impulsively run away from the accident" (Defense Motion Exhibit I — Resentencing Mitigation Report of Phillip Guttman at 5).
Therefore, the Court also finds that the record established that abuse suffered by Terrance was a "significant contributing factor" in his criminal behavior.
C. Prong 3: Upon Consideration of The Nature and Circumstances of The Crime as Well as The History, Character, and Condition of The Defendant, The Original Sentence Imposed [*22]Was Unduly Harsh.
As to the final prong, "upon consideration of the nature and circumstances of the crime as well as the history, character, and condition of the defendant, [the court must find that] the original sentence imposed was unduly harsh" (PL § 60.12[1][c]).
The DVSJA acknowledges the need for the courts to have the discretion to address the impact of domestic violence and enables the courts to consider, for example, the psychological consequences that lengthy mandatory incarceration can have on a traumatized domestic violence survivor. In giving due consideration to factors such as the nature of the crime, accountability, public protection, deterrence, and rehabilitation, the DVSJA adds to the court's duty an additional layer of analysis when contemplating the appropriate sentence for a victim of domestic violence. It calls on the courts to take a more compassionate, problem-solving approach rather than one driven by retribution and highlights rehabilitation goals and successful and productive reentry and reintegration into society. The goals of public safety, deterrence, and rehabilitation are not achieved by a lengthy sentence of incarceration for an individual whose criminal conduct was borne out of trauma from severe domestic violence (People v. D.M., 72 Misc 3d 960, 967—68 [Sup. Ct. Queens Co. 2021] [internal citations and quotations omitted]).
The purpose of sentencing is to "ensure the public safety by preventing the commission of offenses through the deterrent influence of the sentences authorized, the rehabilitation of those convicted, the promotion of their successful and productive reentry and reintegration into society, and their confinement when required in the interests of public protection" (PL § 1.05[6]).
Both Mr. Guttman and Dr. Golden made clear that LGBTQ individuals face unique hardships in incarceration that heighten their vulnerability and hinder rehabilitation. This includes harassment, and physical assault from both fellow inmates and correctional staff, often targeted due to perceptions of weakness or difference. Terrance is without support, resources and recourses. Moreover, the intensive therapy necessary to address Terrance's trauma and needs are not available to him while incarcerated (July 28 Tr. at 120; Nov. 17 Tr. at 237; see also Defense Motion Exhibit I — Resentencing Mitigation Report of Phillip Guttman at 6). In fact, Dr. Golden specifically stated that continued incarceration would negatively impact Terrance's mental health (Nov. 17 Tr. at 250-251). Given these factors, Terrance's continued incarceration not only places him at heightened risk of harm but also impedes his access to the support and therapy necessary for rehabilitation. A reduced sentence would allow him to transition to community-based treatment programs that address both the trauma underlying his criminal behavior and the challenges he faces as a gay man in the carceral system.
Terrance has expressed genuine remorse for his actions, demonstrating a clear understanding of the harm he caused and a commitment to making amends. He has engaged in self-reflection, as evidenced by his conversation with Dr. Golden and Mr. Guttman. His reintegration plan includes certification and job aspiration, and continued engagement in therapy to address the underlying trauma that contributed to his criminal behavior. Additionally, letters of support from family underscore his readiness to transition back into society as a productive and law-abiding individual. His institutional record reflects only one minor disciplinary incident, further demonstrating his ability to comply with institutional rules and adapt to structured environments (see Defense Motion Exhibit O — DOCCS Program and Disciplinary Record). This [*23]record suggests that he has used his time in custody constructively and is unlikely to pose a risk to public safety upon release.
Therefore, under the particular circumstances of this case, and upon consideration of the nature and circumstances of the crime as well as the history, character, and condition of the defendant, this Court finds that the original sentence imposed was unduly harsh (PL § 60.12[1][c]).
The defendant will therefore be resentenced on his plea to Manslaughter in the First Degree (PL § 125.20), a B violent felony, to a definite sentence of five years incarceration to be followed by five years of post-release supervision (PL § 60.12[2][a]; PL § 70.02; PL § 70.45[2][f]).
This constitutes the Decision and Order of the Court.
Dated: April 2, 2025
Kings County, New York

Footnotes

Footnote 1:Given the nature of the motion, the defendant has moved to remain anonymous. As such, the Court has chosen not to include his last name or the last name of any of his family members in this decision. Moreover, the defendant is sometimes referred to as "Terrance" and other times as "Terry" in the hearing minutes and accompanying affidavits. For consistency, the Court has chosen to refer to him as "Terrance."

Footnote 2:To "preserve confidentiality in [a] sensitive proceeding" such as this, this Court further orders that any unredacted resentencing motion paper be sealed and that the public not have access to it (Matter of Hynes v. Karassik, 47 NY2d 659, 664 [1979]).

Footnote 3:The hearing was conducted on July 28, 2023; November 16, 2023; November 17, 2023; February 7, 2024; February 26, 2024; May 1, 2024; May 31, 2024; July 3, 2024; August 13, 2024, September 27, 2024, November 20, 2024, and December 11, 2024.

Footnote 4:Throughout the hearing minutes, these names appear as "Kobe," "Koby," and "Colby". For consistency, the Court has chosen to use "Koby."

Footnote 5:In opposition to this point, the People submitted an affidavit from a physical who opinioned that the abrasions suffered by Terrance were "consistent with a laceration caused by multiple shards of glad hitting the skin from a windshield that shattered with great force at close range in a motor vehicle accident than with a puncture or slice from a blade" (see People's Ex.13 at ¶ 12: see also People's Ex. 11).

Footnote 6:In opposition to this point, the People submitted the grand jury testimony of this individual who testified that Terrance said, "I need somewhere to cleanup and hide" (see People's Ex. 10 at 26).

Footnote 7:Mr. Guttman did not speak with Derrick E. for his reports or testimony at the hearing (July 28 Tr. at 113).

Footnote 8:In some portions of the hearing minutes, Terrance's sister's name is spelled "India," in others, it is spelled "Endia." For consistency, the Court has chosen to spell the name as "Endia."

Footnote 9:Due to the sensitive nature of various portions of testimony, the hearing was closed to the public at multiple points at the defense's request and with the people's consent. This decision will not explicitly state his health diagnosis to respect Terrance's privacy.

Footnote 10:Mr. Guttman defined intimate partner violence as "domestic violence that occurs specifically between two romantically involved partners" (July 28 Tr. at 38, 108).

Footnote 11:Dr. Golden did not speak with Derrick E. for her reports or testimony at the hearing (Nov. 17 Tr. at 271).

Footnote 12:The Court notes that Derrick's attitude and demeanor throughout his testimony at the hearing were aggressive, combative, and often disrespectful. When asked how he felt about being there, he said, "I am upset. I am aggravated. I feel like this is an inconvenience of my time." (May 1 Tr. at 39). 

Footnote 13:In opposition to this portion of Derrick's testimony, the defense entered multiple photos of Derrick with alcohol in his hand into evidence (July 7 Tr. at 88-95; see Defense Ex. F, G, H, I). One image was captioned "drinking till 7:00 AM. # goodmorning," and the other was captioned "my face when I need that drink" July 7 Tr. at 90, 94).